**In the Matter of Guido COCILOVO.**

**No. 85 Civ. 5584 (WK).**

United States District Court,
S.D. New York.

Oct. 4, 1985.

As Amended Oct. 18, 1985.

Barry Turner, New York City, for contemnor.

Rudolph W. Giuliani, U.S. Atty., S.D. of N.Y. by Robert B. Bucknam, Asst. U.S. Atty., New York City, for the Government.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

Guido Cocilovo seeks release from an order of civil contempt entered by me on December 20, 1984. He claims that because he has been confined for almost ten months on that order with no indication that he might yield to its coercive effect, I must conclude that the order has lost such effect and release him. He relies on two Court of Appeals' opinions: *Simkin v. United States* (2d Cir.1983) 715 F.2d 34, and *Sanchez v. United States* (2d Cir.1984) 725 F.2d 29.

Without going into detail as to my reasons, I am satisfied that the authorities cited compel me to release him. However, like Judge Brieant (*In the Matter of Dorie Clay* (S.D.N.Y. June 27, 1985) M–11–188), I firmly believe those cases to have been wrongly decided and shall try to set forth my reasons for so believing, supplementing the views I rather hastily expressed in *Matter of Parish* (S.D.N.Y.1985) 613 F.Supp. 356.

## DISCUSSION

Prior to *Simkin*, it was generally assumed that contemnors who had no emotional or other disability which prevented them from testifying had "the keys of their prison in their own pockets," *Shillitani v. United States* (1966) 384 U.S. 364, 368, 86 S.Ct. 1531, 1534, 16 L.Ed.2d 622; *In Re Weiss* (2d Cir.1983) 703 F.2d 653, 661; *United States v. Handler* (2d Cir.1973) 476 F.2d 709, 714; *In Re Grand Jury Investigation* (3d Cir.1979) 600 F.2d 420, 423 & n. 8, all citing *In Re Nevitt* (8th Cir.1902) 117 Fed. 448, 461, and that it was accordingly permissible to hold them in jail for the full eighteen months (or for the life of the grand jury should that be shorter) provided by 28 U.S.C. § 1826(a). Judge Brieant's opinion in *Matter of Thornton* (S.D.N.Y. 1983) 560 F.Supp. 183, sets forth the then existing rule, which was based on the assumption that § 1826 itself establishes that a civil contempt sentence of eighteen months or less is "coercive, not punitive." Thus, he observed (560 F.Supp. at 184):

The purpose of civil contempt is to coerce, not punish. *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441–42, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911). In cases of indefinite civil confinement the court is called upon periodically to review the contemnor's status, to prevent a *de facto* sentence of life imprisonment. *Catena v. Seidl*, 65 N.J. 257, 262, 321 A.2d 225, 228 (1974). *Cf. Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972), holding that '[D]ue process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.'

A contemnor held pursuant to 28 U.S.C. § 1826, however, faces no similar risk, because Congress in enacting the statute set an eighteen month maximum limitation on the incarceration of those who refuse to comply with grand jury requests. By Congressional definition, then, the eighteen month period is regarded as coercive, not punitive. *United States v. Dien*, 598 F.2d 743, 745 (2d Cir.1979).

In *Dien,* the case cited by Judge Brieant, the contemnor had sought to make the point that the facts in his peculiar situation —specifically, his "fear of reprisal against himself and his family"—indicated that he would never testify and that "his incarceration for contempt" was therefore "punitive rather than coercive." The Court of Appeals refused to consider this contention, observing (598 F.2d at 745):

> Such an argument if sustained would only benefit those who persistently refuse to cooperate despite immunity orders and *in effect would emasculate section 1826.* (Emphasis supplied.)

*Simkin*—apparently *sub silentio* overruling *Dien*—specifically required consideration of the contention rejected by *Dien.* Under *Simkin* a district court in each and every case must, despite the congressional determination that eighteen months is by definition coercive, make an individual decision whether the particular contemnor before it is likely to yield to further incarceration. This ruling, quite naturally, has generated a host of motions and has resulted in the release in this District alone of a total of at least nine contemnors, including two by myself. Demetrios Papadakis (June 11, 1985) 613 F.Supp. 109 (WK); Dorie Clay (June 27, 1985) Docket # M–11–188 (CLB); Lionel Jean-Baptiste (July 3, 1985) Docket # M–11–188 (PKL); Milton Parish (July 24, 1985) 613 F.Supp. 356 (WK); Dr. Jean Ford and Michelle Thomas (July 26, 1985) Docket # M–11–188 (RWS); Jacqueline Bernard and Olive Armstrong (July 31, 1985) Docket # M–11–188 (GLG); and Jesse Lopez (October 22, 1984) Docket # M–11–188 (CBM).[1] In consequence, there seems

to be developing a rule of thumb that, absent some extraordinary showing by the government, a contemnor who has shown sufficient fortitude to withstand about six months in jail is entitled to release. It has thus come to pass—exactly as predicted by the Court of Appeals in *Dien*—that the proposition there rejected but adopted in *Simkin* has only benefitted those who persistently refuse to cooperate despite immunity orders and has in effect emasculated section 1826(a). This, I feel, is an unfortunate turn of events.

Properly to evaluate *Simkin's* departure from the *Dien* doctrine, one must start with the origins of § 1826(a). The enactment of that section was part of a congressional response to a critical problem faced by the criminal justice system. It is a recognized fact that there are certain types of criminal conduct (including terrorism and the furtherance of organized crime) which threaten the very fabric of our society and which, as a practical matter, cannot be prosecuted unless "insiders" are persuaded or compelled to testify against their accomplices. As part of its effort to deal with this problem Congress (having in 18 U.S.C. §§ 6002 and 6003 authorized the grant of use immunity), in § 1826(a) authorized prosecutors to confront a potential witness with the choice of testifying or facing up to eighteen months in jail. It was hoped that the coercive effect of such a threat would produce a significant amount of relevant testimony. (*See* 1970 U.S.Code Cong. and Admin.News, p. 4022.)

The constitutional authority for the enactment of such legislation was established

---

1. Of these civil contemnors, Demetrios Papadakis was released after he had served about six months, as were Dr. Jean Ford (RWS), Michelle Thomas (RWS), Jacqueline Bernard (GLG), Olive Armstrong (GLG), Milton Parish (WK), and Lionel Jean-Baptiste (PKL). Dorie Clay (CB) was confined for about three and one-half months prior to her release. The transcript of the hearing which resulted in the release of Jose Lopez (CBM) does not disclose the length of the contemnor's confinement.

So far as I can determine, only two Judges in this District have denied a contemnor's *Simkin* motion: Judge Keenan in *Matter of Esposito*

(August 20, 1985), and Judge Carter in *Matter of Remon, et al.* (October 27, 1983). (*See* exchange of correspondence between the Court and the United States Attorney's Office annexed to the Court's Memorandum of October 3, 1985). In Judge Keenan's case the contemnor had been confined for less than three weeks and had indicated to the committing judge that "he needed more time to decide whether he would testify." In Judge Carter's case, the contemnors had acted in a devious fashion and had failed, after obtaining several adjournments for the purpose, to produce supposedly favorable testimony in their behalf.

by the Supreme Court in *Shillitani v. United States, supra.* There (in circumstances where the involved contemnors had—like Simkin—spent considerable time in jail with no sign of weakening) the Court was confronted with the question whether one could lawfully be given a two-year sentence for contempt without the protections afforded by criminal procedures. Recognizing that any confinement in jail had punitive aspects, the Court fashioned a very simple test to determine whether such a sentence was constitutionally permissible: (1) was it the *purpose* of the confinement to compel testimony? and (2) was it within the *power* of the contemnor to supply such testimony (*i.e.*, did he have the keys to the jail house in his pocket)? The Court thus expressed its holding (384 U.S. at 370, 86 S.Ct. at 1535):

> While any imprisonment, of course, has punitive and deterrent effects, *it must be viewed as remedial [i.e.,* coercive] if the court conditions release upon the contemnor's willingness to testify. (Emphasis supplied.)

In conformity with that principle, the Court ruled that a contemnor must be discharged at the conclusion of the term of the grand jury before whom he had been subpoenaed, because he would then have lost his ability to comply with the subpoena. There is, however, no suggestion in the opinion that, in addition to using the above-quoted litmus for determining the *purpose* of the confinement, a court should also be concerned with its *effect* (*i.e.*, the extent of the contemnor's desire to use the key in his pocket). Indeed—as above indicated—it was quite apparent that the particular sentences there involved had had no coercive effect whatever. It is therefore clear that, as the *Simkin* court itself recognized, there is no constitutional requirement for the *Simkin* rule. As to its wisdom, the pertinent questions would appear to be: (1) is the rule likely to result in a situation where contemnors will almost routinely be released after six months? and (2) will such result emasculate § 1826(a), as the *Dien* court predicted?

As to the first question, the *Simkin* court, by emphasizing a district judge's "virtually unreviewable discretion" in these matters, sought to forestall an affirmative answer (715 F.2d at 38). However, such unreviewable discretion will, I predict, have little effect on the number of contemnors released. District judges are not governed wholly by fear of reversal, but must consider the implication of their oaths of office. Once the *Shillitani* holding—focussing on the purpose of the sentence and the contemnor's continuing ability to respond to the subpoena—is rejected in favor of an obligation to make a case by case determination of the strength of the contemnor's intransigence, we are off on an uncharted sea. I predict that the outcome will be an almost routine release of contemnors after about six months.[2] The plain fact of the matter is that once a person has served six months in jail with no sign of weakening, there will rarely be any valid reason for assuming that the next twelve months (or any fractions thereof) are going to be any more effective.

It is no answer—as the *Simkin* opinion suggests—that emasculation of the remedy of civil contempt leaves available the sanction of criminal contempt, which "can fully

---

**2.** Although perhaps not determinative, it is worth noting that any rule requiring an individualized determination of the effect—as opposed to the purpose—of an order of contempt will create an administrative nightmare. The *Simkin* court, anticipating this result (*see* 715 F.2d at 38, fn. 3), sought to minimize it by ruling that a contemnor had no right to testify upon his application for release. (715 F.2d at 38, n. 2; *Sanchez, supra,* 725 F.2d at 32.) I believe that this ruling will have little effect. District judges who have been commanded to make a conscientious effort to determine whether or not further confinement is reasonably likely to induce testimony (715 F.2d at 37) will have to decide for themselves what evidence is necessary to enable them to make the required determination. Being unable to see how any judge can rationally determine what coercive effect a sentence is having without hearing and observing the person whose fortitude is being evaluated, I predict that they will almost routinely permit such persons to testify. Moreover, as I noted in my opinion in *Matter of Parish, supra,* 613 F.Supp. at 357, I do not see how—granting the *Simkin* rule—the frequency or timing of applications for release can rationally be restricted.

vindicate the court's authority" (715 F.2d at 37). In the first place, where the Congress has seen fit to establish two coercive mechanisms, the judiciary—absent constitutional necessity (which *Simkin* does not assert and which *Shillitani* in any event precludes)—is without warrant to emasculate one of them. Moreover, it hardly needs demonstration that the "threat" that there might some day be found a prosecutor, grand jury, petit jury and judge who would all agree that a particular recalcitrant be sent to jail for more than six months is far less persuasive than having a single judge look him or her in the eye and say "you testify today or you don't go home either tonight or for the next eighteen months (unless you use the key I am putting in your pocket)."

Perhaps the *Simkin* court's above-noted concern with vindicating "the court's authority" provides an insight into a misunderstanding of the judiciary's proper role in implementing § 1826(a). When Congress, in connection with the enactment of the Organized Crime Control Act of 1970, P.L. 91–452, 84 Stat. 922 (1970), codified the judicial practice previously sanctioned by *Shillitani*, it was not concerned with protecting judicial dignity but with advancing its own ward against crime. Indeed, in its Statement of Findings and Purpose, Congress specifically stated the Act's goal to be the "eradication of organized crime in the United States *by strengthening the legal tools in the evidence-gathering pro-*

cess ..." (emphasis added). (1970 U.S. Code Cong. & Admin.News, p. 1073.) Moreover, Congress certainly could not have assumed that many terrorists, drug dealers and organized crime figures (who routinely risk their lives for "the cause" or wealth or power) would be worn down by eighteen months in jail. What it was attempting to do was to create a credible threat which would induce at least some recalcitrants to avoid imprisonment altogether by joining forces with the righteous. I respectfully suggest that it is not within the province of the judiciary to drain this threat of all credibility and thus—adapting the language of *Dien*—emasculate an act of Congress.[3]

So far, I have discussed only the *coercive* effect of § 1826. That section also plays a significant part in enabling prosecutors to obtain testimony through *persuasion,* and its usefulness in that area has also been eroded. During my years as a prosecutor I came to the firm belief—which has been strengthened by subsequent experience at the Bar and on the Bench—that most criminals and their associates have a strong impulse to come to terms with established society, which impulse it is the prosecutor's duty to exploit. There are, of course, many strong counterforces, among the strongest of which is the almost universal repugnance to being a "rat" or traitor to one's associates. It is the prosecutor's task to overcome such countervailing forces. Section 1826(a), in its pristine

---

**3.** The *Shillitani* rule does not, of course, in any way deprive district judges of their equitable power to release any particular contemnor should it be determined that he "realistically" is "incapable of compliance" with the order to testify (*see United States v. Wendy* [2d Cir.1978] 575 F.2d 1025, 1030). *See also United States v. Handler* (2d Cir.1973) 476 F.2d 709, 715, fn. 7, where the Court stated:

> In ruling as we do, we emphasize...the remedial nature of [contemnor's] confinement. The importance of that fact is the recognition of [contemnor's] continuing right to petition to district court for release if it appears that he is no longer able to comply with the order to testify, or if the public necessity that led to the grant of immunity and the order to testify should cease to exist. (Citation omitted.) That is a matter within the province of the district court, not ours.

Nor does it deprive district judges of the discretion to release a contemnor when it is determined that it would be inequitable to confine him further. An interesting example is provided by Judge Carter's opinion in *In re Cueto* (S.D.N.Y.1978) 443 F.Supp. 857. There, after a scholarly discussion, Judge Carter flatly rejected the argument subsequently accepted by *Simkin.* He then went on to balance the Government's need for the subpoenaed evidence against the contemnors' good faith (religious) reason for refusing to give it and their importance to their religious community, and concluded that he should, in the exercise of discretion, release them. In the instant case, if I did not feel that *Simkin* mandated contemnor's immediate discharge, I would probably designate a magistrate to investigate and report on his complaint that he was not receiving proper medical attention.

state, gave the prosecutor a valuable weapon in that struggle. If a recalcitrant can be certain that the price of silence is eighteen months in jail, he may be able to persuade himself—and even some of his associates—that the price to himself and to those dependent on him is too high, and that in testifying he is not being a "rat," but yielding to the inevitable. Obviously a six-month threat (or a lesser one as the process of emasculation continues) is far less effective in this regard.

Despite my foregoing views, I am constrained by *Simkin* and *Sanchez* to order the contemnor's release. However, in view of the importance of the question and the clear conflict of those cases with the Court of Appeals' former decision in *Dien,* I most respectfully but strongly urge that—in this or some other case [4]—the matter be again reviewed at the appellate level.

SO ORDERED.

---

[4]. Some might not deem this case appropriate for appellate review, in that the whole effort to coerce this particular contemnor has from the beginning been an exercise in futility. When I entered my original order holding him in contempt, he had just begun serving a fifteen year Florida state sentence. The Assistant United States Attorney has now advised me that under Florida law my civil commitment did not interrupt his criminal sentence, and thus will not for one hour postpone his ultimate return to his family (however that term may be defined). The sole effect of this order "releasing" him will be to lessen crowding in the MCC and transfer from federal to state taxpayers the intervening cost of his care and nurture. On the other hand, some might deem this case to present an ideal situation for appellate review, in that—as was ultimately the situation in *Shillitani*—there will be no tendency to allow emotional overtones to interfere with detached consideration of the vital legal questions involved.