Jean Elizabeth MORGAN, Appellant,

v.

Eric A. FORETICH, Appellee.

Nos. 86–1615, 87–33, 87–936, 87–942 and 87–987.

District of Columbia Court of Appeals.

Argued April 25, 1988.
Decided Aug. 5, 1988.

Stephen Sachs, with whom John Vanderstar and G. Allen Dale, Washington, D.C., were on the brief, for appellant.

Eric A. Foretich, pro se.

Linda P. Holman, Washington, D.C., guardian ad litem.

Before MACK, BELSON and STEADMAN, Associate Judges.

STEADMAN, Associate Judge:

The formal parties to this appeal are the divorced parents of a daughter, H, the ultimate real party in interest. She was born in 1982. On November 8, 1984, appellant Morgan was awarded custody of H and appellee Foretich was given liberal visitation. Almost continuously since that date, the parties have been in litigation on these issues, with numerous appeals to this court and two published opinions. *See Morgan v. Foretich*, 521 A.2d 248 (D.C.1987) (*Morgan I*), and 528 A.2d 425 (D.C.1987) (*Morgan II*). Now before us is an appeal from an order of August 19, 1987, granting Foretich a two-week summer visitation with H and a subsequent order of civil contempt and imprisonment of Morgan for refusal to comply with the August 19 order.[1]

### I.

Some of the background facts, through August of 1986, were recited in our previous opinions. In January 1985, within two months of the custody and visitation order of November 8, 1984, Morgan began to make accusations that Foretich was sexually abusing H during visitation. Motions were filed by both parties relating to changes in custody and visitation and. with respect to evaluation of H. These motions were set for hearing before Judge Herbert B. Dixon in November 1985. In his order of December 27, 1985, Judge Dixon denied all these motions with the exception of a minor modification of Foretich's visitation rights.

Matters first came to a head in February 1986, when Morgan refused to allow H to visit Foretich in accordance with the court-ordered visitation schedule. Hearings were held in June and July of 1986 on several motions, including Foretich's motions to hold Morgan in contempt and for change of custody and Morgan's motions for temporary suspension of visitation and

---

1. Also before us and dealt with in this opinion are certain collateral orders, entered in the same time frame, relating to recusal and closure. Prior appeals consolidated with the appeals from the two-week visitation and civil contempt orders are effectively mooted by our decision today.

to compel discovery. On July 17, 1986, Judge Dixon orally announced his finding that Morgan had failed to prove by a preponderance of the evidence that Foretich had abused H, and that Morgan had disobeyed the visitation orders without lawful justification or excuse. A series of further hearings and orders then ensued, resulting in a finding of contempt and order of incarceration in August 1986. We stayed the order pending appeal, with various conditions including the posting of a security approved by the court in the amount of $200,000. On appeal, we upheld the closure of the contempt hearings, *Morgan I, supra,* and affirmed the judgment of contempt, *Morgan II, supra.*

Meanwhile, Judge Dixon had ordered that visitation be resumed. When Morgan again failed to comply, Judge Dixon found her in contempt and ordered her incarcerated on February 17, 1987. Morgan was released from jail on February 19, 1987, and on February 24, 1987, visitations resumed for the first time in over a year. From February 24 through April 1, 1987, the visits were supervised and lasted one hour. On April 1, Judge Dixon ordered that the visits be extended to four hours.[2]

On April 6, 1987, Judge Dixon began a series of hearings on a motion by Foretich for a change of custody and termination of Morgan's parental rights and on Morgan's cross motion to suspend visitation, or, in the alternative, to require supervised visitation. Seventeen days of hearings with numerous witnesses were held over the course of the spring and summer, ending on August 21, 1987.

During the course of the hearings on the motions, Judge Dixon entered several orders continuing to gradually expand the visitation schedule. On April 21, 1987, he ordered the first overnight unsupervised weekend visitations. Pursuant to further orders, H spent nine or ten weekends with Foretich. Several emergency stays of the weekend visitation orders sought by Morgan and H's guardian were denied by this court. H's guardian played some part in most of these weekend visits and submitted reports of her observations to Judge Dixon.

Then on August 19, 1987, with the hearings still not completed,[3] Judge Dixon entered an order providing for an extended visitation from August 22 through September 6, 1987. In his six-page order, he noted, *inter alia,* that since H was scheduled to return to school on September 8, "[w]hatever the court's ultimate ruling may be on the pending motions, to further delay the defendant-father's entitlement to summer visitation with his child until that ultimate ruling results in a denial of said summer visitation by default." [4]

Morgan appealed this visitation order that same day. Her emergency motion for stay pending appeal filed the following day was denied by this court on August 21. Morgan failed to comply with the visitation order. She secreted the child and refused to reveal her whereabouts. (To this day, H remains hidden.) On August 24, Judge Dixon issued an order to show cause why Morgan should not be held in contempt. On the same day, Morgan moved to have Judge Dixon recuse himself on the ground that he had prejudged both her credibility and the evidence on which her defense rested. She also moved to open her contempt hearing to the public, unseal the record and modify a closure order of April 13.[5]

2. Though Judge Dixon entered an order for unsupervised four-hour visits, Foretich invited H's guardian ad litem to supervise the visits. All of the visits were in fact supervised by the guardian until the court expanded them to overnight visits.

3. The final day of receiving courtroom evidence was on August 21. It was agreed at that time that the parties would submit proposed findings of fact and comprehensive closing arguments in the way of a post-trial brief, as well as any further evidentiary proffers, by September 11, with further time for responses thereto. We

were advised at oral argument that no final trial court rulings have been made on the motions which were the subject of the April–August hearings.

4. The order also provided for seven weekend visits during the fall months of 1987.

5. Essentially, that order restricted public disclosure of specific sex abuse allegations in this proceeding or documents, records or images concerning the same.

After a hearing held on August 26, Judge Dixon held Morgan in contempt and ordered her incarcerated, effective August 28. He also ordered that the security posted one year earlier pursuant to this court's order be forfeited at the rate of $5,000 per day. On August 27, Morgan appealed the contempt judgment and sought a stay pending appeal. The stay was denied and Morgan was incarcerated on August 28, where she remains.

## II.

A principal issue before us is whether the record supports the trial court's action in ordering a two-week summer visitation. Our standard of review is well-established. Trial court decisions as to visitation rights are reversible only for clear abuse of discretion. *Hamel v. Hamel*, 489 A.2d 471, 475 (D.C.1985); *Jackson v. Jackson*, 461 A.2d 459, 460 (D.C.1983). By statutory command, a trial court judgment may not be set aside except for errors of law, unless it appears the judgment is "plainly wrong or without evidence to support it." D.C. Code § 17–305(a) (1981). Thus, to the extent that such decisions rest on factual foundations, such findings are binding unless clearly erroneous. *Morgan II, supra*, 528 A.2d at 429; *District–Realty Title Insurance Corp. v. Forman*, 518 A.2d 1004, 1007 (D.C.1986). Such is particularly the case where, as here, the findings rest in significant part on considerations of credibility. *See, e.g., Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985); *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 546–47 (D.C.1981). "If the [trial court's] account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson, supra*, 470 U.S. at 573–74, 105 S.Ct. at 1511.

The critical factual determination challenged by Morgan was that sexual abuse of H by her father had not been proven, or, as the court put it, the evidence was "in equipoise." That finding, asserts Morgan, was "plainly wrong."

As indicated in the facts recited above, this issue has been in dispute between the parties since January of 1985. As a result, a trial court file has developed in this case of a size apparently unequaled in a District of Columbia domestic relations proceeding.[6] Morgan asks that the entire record be taken into account, but in particular focuses upon the evidence presented in the 17 days of hearings between April and August of 1987. She notes, of course correctly, that our prior opinion affirming the trial court did not extend to developments subsequent to August 1986.

A review of the record shows that there was probative evidence on both sides of the issue of abuse. The ultimate question, however, is not how we weigh the evidence but rather whether a finder of fact, fully and personally knowledgeable of not only the evidence presented in the April to August hearings but also the entire history of these proceedings from November 1985 forward,[7] would be clearly erroneous in concluding that the alleged sexual abuse had not been proven and would commit a clear abuse of discretion in allowing a two-week visitation. We cannot so conclude.

It is important to keep in mind the posture of the case at the time of the challenged order. The underlying matters before the court were Foretich's motion for change of custody and Morgan's cross-motion to suspend visitation. Evidentiary hearings on those motions were coming to a close. So was the summer, with H scheduled to return to school in early September. H's relationship with her father, interrupted for over a year by Morgan on grounds found baseless at the time, had been resuming on a gradual basis. The court was

---

**6.** The proceedings in 1985, 1986, and 1987 consist of some 4,000 pages of transcript with approximately 75 witnesses, according to Morgan's own brief.

**7.** At one point in the proceedings, Judge Dixon observed that with one more change of attorneys, he, the trial judge, would be the longest participant in the litigation short of the parties themselves.

satisfied that any prospect of physical or emotional harm beyond that already caused by the litigation was effectively neutralized.[8] With the ultimate issue still open, the court was dealing with the reality that a child's life was moving on.[9]

In this litigation, neither party can conclusively speak for H. She has her own champion, a court-appointed guardian. Although the guardian states that she is in clear disagreement with the trial court's order for the extended summer visitation, we think correct her assessment that she "cannot argue that the order was without evidence to support it or an abuse of Judge Dixon's discretion."

### III.

Morgan raises four other issues in this appeal. Only one, the challenge to the forfeiture of the posted security, reveals reversible error. See Part IV, *infra*.

 1. *Defense of necessity.* Criminal law recognizes the doctrine that an otherwise criminal act is excused "if the harm that would have resulted from compliance with the law would have significantly exceeded the harm actually resulting from the defendants' breach of the law." *Griffin v. United States,* 447 A.2d 776, 777 (D.C.1982), *cert. den. sub nom. Snyder v. United States,* 461 U.S. 907, 103 S.Ct. 1879, 76 L.Ed.2d 810 (1983). This defense of necessity does not require proof that harm is actually occurring, but only that the defendant have a reasonable belief that harm is imminent. *Id.* at 778. It does not exonerate one who has the opportunity to resort to "a reasonable legal alternative to violating the law." *Id.*

 Morgan argues that this doctrine should apply on the facts of this case. To some extent, this is a variant of the argument presented on the prior appeal that contempt does not lie where the mother has a "duty to protect the child from abuse." *Morgan II, supra,* 528 A.2d at 428. In any event, the situation here is far different from that facing one who violates a criminal law. Here there was a specific court order, requiring specific conduct tailored to a specific fact situation—an order which we on appeal had refused to stay. Civil contempt could become meaningless if a lawful defense could rest on the ground that a party took a different view, however reasonable, of the potential harm in compliance.[10] To the extent that noncompliance may be justified as preserving the opportunity for appellate review, the defier acts at his or her peril in so doing. *Bolden v. Bolden,* 376 A.2d 430, 432–33 (D.C.1977) ("It is axiomatic in our system of jurisprudence that where a court with jurisdiction over both the subject matter and the parties enters an order, such order must be obeyed."); *In re Banks,* 306 A.2d 270, 274 (D.C.1973).

 2. *Trial judge disqualification.* Subsequent to the entry of the two-week visitation order but prior to the contempt proceeding, Morgan moved to have Judge Dixon recuse himself. This motion was denied. Morgan argues that constitutionally she was entitled to an impartial judge, an argument not in dispute. What is in dispute here is whether she was denied such a judge. Normally, bias must stem from an extrajudicial source, *In re Thompson,* 419 A.2d 993, 995 (D.C.1980); *Gregory v. United States,* 393 A.2d 132, 142 (D.C. 1978), although an extreme manifestation

---

**8.** The court cited its continuous availability for emergency hearings, Morgan's right to reasonable telephone contact with the child during visitation, monitoring of the visitation by the guardian, and the presence of Foretich's parents or his wife with the child during visitation.

**9.** Understandably the court was unwilling at that moment to make a definitive finding. As it noted, its ultimate ruling on pending issues could range "from a limitation imposed upon [Foretich's] rights of visitation and a denial of his motion for change of custody, to an order

granting [Foretich's] motion for a change of custody and imposition of limitations upon [Morgan's] rights of visitation, or to an order committing the child to a foster care placement."

**10.** The same may be said of Morgan's argument that the Parental Kidnapping Prevention Act recognizes a defense if the action "is taken to protect the child from imminent physical harm." D.C.Code § 16–1023(a)(1) (1987 Supp.).

of bias during trial can result in disqualification. *Whitaker v. McLean*, 73 App.D.C. 259, 118 F.2d 596 (1941) (judge's bias during trial appeared to have become "overpowering"). We think any such allegation here is without foundation. Morgan points to rulings by the trial court refusing to permit participation in the contempt hearing by an out-of-state member (new to the case) of the major law firm representing her,[11] and to rulings excluding evidence. These may or may not be errors of law,[12] but they hardly constitute strong evidence of bias. No trial court conduct could survive such a test. Morgan also asserts that Judge Dixon prejudged her credibility in past proceedings and thus is disqualified from sitting at this subsequent proceeding, citing *Keating v. Superior Court*, 45 Cal.2d 440, 289 P.2d 209 (1955) (trial judge stated that he believed the defendant had willfully given false testimony and that he therefore had no confidence in the defendant's integrity and veracity or in certain books of account kept by the defendant). This argument is significantly brought into question by the failure to raise any bias objection during the April to August hearings. In any event, the record does not establish that recusal was called for here.[13]

■ 3. *Public trial on contempt charges.* A good portion of the proceedings on August 26, the hearing on the contempt show cause order, was open to the public. The hearing was closed only for the segment of Morgan's testimony when she insisted upon reciting allegations as to specific acts of sexual abuse upon H. She argues that this limited closure violated her First and Fifth Amendment rights to an open hearing. In so doing, she invites us essentially to revisit the issues decided in our prior Morgan opinions. This we decline to do.[14]

As we recently reasserted in *Mokhiber v. Davis*, 537 A.2d 1100, 1108 n. 8 & 1115–16 n. 13 (D.C.1988), family cases involve special considerations. However disclosures outside these proceedings and other developments may ultimately affect the issue of continued closure, we do not think the trial court erred in the limited closure of the contempt proceeding on appeal before us.[15]

## IV.

■ In addition to the civil incarceration of Morgan, the trial court's written order of August 27, 1987 provided:

That the plaintiff's $200,000.00 bond previously posted following this Court's order of August 5, 1986, shall be and hereby is forfeited at the rate of $5,000.00 per day, excluding Saturdays, Sundays and legal holidays, until the minor child has been taken into the custody of this Court and made available to the defendant for visitation and for placement in

---

11. This firm member was presented at the beginning of the contempt hearing on a motion to be admitted pro hac vice, which was denied.

12. Such rulings, although Morgan's brief styles them as erroneous and makes references to the excluded evidence, are not argued as separate major assignments of error; rather, the rulings are focused on as indicia of bias. Indeed, the rulings in their own right would seem more readily reviewable on appeal from a final judgment on the motions. See note 3, *supra*. Morgan's basic position as we understand it is that on the evidence actually before the trial court, it was plainly wrong in concluding as it did.

13. The guardian has provided her views on this issue as follows: "Judge Dixon has demonstrated no impermissible bias which would require his recusal.... Judge Dixon has exercised great patience and restraint with appellant. He has afforded her courtesy throughout the proceedings.... The delay and inconvenience that

would result from the trial court's disqualification and the subsequent reappointment of another judge is unthinkable."

14. Although we did not expressly discuss any First Amendment rights that Morgan may have, First Amendment cases were specifically considered in the opinion.

15. Morgan also challenges other aspects of the order of April 13, 1987, limiting disclosures in this case. See note 5, *supra*. This order was not appealed when entered, and it does not appear that these issues are properly before us at this time. Unlike the motion to open the hearing, which was denied on August 26, we are unable to find in the record any ruling regarding the unsealing of the record or modification of the closure order until the written order of September 18, 1987, from which no further appeal was taken. *See McClurkin v. United States*, 472 A.2d 1348, 1352 (D.C.), *cert. denied*, 469 U.S. 838, 105 S.Ct. 136, 83 L.Ed.2d 76 (1984).

accordance with the further order of this Court.

Morgan asserts that the trial court lacked authority to impose this specific condition. We agree.

The $200,000 security was posted pursuant to the order of this court which stayed the civil contempt adjudication in August 1986. It took the form not of a surety bond but rather of a deed of trust on certain real property owned by Morgan, with the then Clerk and Deputy Clerk of our court named as trustees. By its terms, the deed of trust applied "in the event of [Morgan's] failure to appear before the Superior Court ... in the event that her commitment pursuant to the August 5, 1986, contempt order of that court is finally affirmed on appeal."

On June 30, 1987, we affirmed the contempt order. The mandate was issued on July 21, 1987. By that time, events had long since moved on to further matters. Morgan was regularly appearing before the trial court. Any issue of continuing contempt for failure to obey the orders entered in 1986 was moot.

It is a settled principle of law that a mortgage or bond or deed of trust or other security instrument operates as security for only those obligations which are covered by the agreement of the parties and identified by it. *See, e.g.,* G. NELSON & D. WHITMAN, REAL ESTATE FINANCE LAW 26 (2d ed. 1985); 12 AM.JUR.2d *Bonds* § 25 (1964); *United States v. Powell,* 639 F.2d 224, 225 (5th Cir.1981) (criminal fine imposed upon defendant cannot be satisfied from appearance bond). There is nothing in the record to show that Morgan agreed that the deed

of trust should be converted from essentially an appearance bond to one securing her compliance with trial court orders generally.[16] Therefore, the trial court had no power to, in effect, order a foreclosure on the deed of trust because of Morgan's noncompliance with his subsequent August 1987 orders. By that time, the deed of trust had no more effect than a mortgage fully repaid although not yet cleared from the record. *See* G. NELSON & D. WHITMAN, *supra,* at 435–38. While it is true that the trial court could have imposed a fine in the amount of $5,000, that specific course of action was not chosen. Any attempt to do so in the manner chosen here must be deemed abortive.

## V.

A Kikuyu proverb tells us: "When elephants fight it is the grass that suffers."[17] Here, the grass is a little girl who will be six years old this month. For almost a year, she has been deprived of the company of both father and mother. She is the principal figure in a drama of appalling proportions, no matter what the outcome.

The trial court here, as in many family division matters, has the deeply taxing and unenviable responsibility of struggling to deal justly with changing lives. Inherent in the process are new developments and events. One such development occurred at oral argument before us. In her brief to us, Morgan urged, as a "wiser and fairer" alternative, the appointment of a multi-disciplinary team of neutral experts to evaluate H's case and to recommend an appropriate visitation schedule. The guardian from an early point in her service[18] has

---

**16.** In an order of December 19, 1986, finding Morgan in contempt for failing to comply with an October 1986 order for a supervised one-hour visit, the trial court stayed enforcement of the contempt order pending appeal, "in accordance with the same conditions as those imposed by the District of Columbia Court of Appeals in its Order of August 7, 1986." Although the appeal may be technically still before us, see note 1, *supra,* events have overtaken that December 1986 order as well; visitations resumed in February 1987.

**17.** J. BARTLETT, FAMILIAR QUOTATIONS 925 (15th ed. 1980).

**18.** The guardian was appointed on August 22, 1986, subsequent to the August 1986 contempt proceedings. Her first recommendation proposing a team of neutral experts was filed on October 14, 1986.

We take this occasion to thank the guardian for continuing to undertake this difficult assignment and for the assistance she has provided to date to both the trial court and this court in dealing with the complex legal and factual issues in this litigation.

consistently championed this step. In our order of May 29, 1987, we expressed our confidence that the trial court would consider the use of a court-appointed expert. Now, before us in oral argument, Foretich announced that he no longer opposed the creation of such a team.

We take no firm position on this alternative or other surfacing issues not yet the subject of an appeal. But time moves on as the impasse continues. Morgan cites to us cases for the proposition that when civil coercion fails to serve its coercive purpose, a contemnor must be released, *e.g., Lambert v. Montana,* 545 F.2d 87 (9th Cir. 1976); *In re Cocilovo,* 618 F.Supp. 1378 (S.D.N.Y.1985), an argument to be first addressed to the trial court. The long-term custody and visitation questions remain unresolved, apparently in suspension pending the outcome of this appeal and perhaps other matters. The trial court faces the completion of findings on difficult factual issues, which may include a determination of the causes and extent of any physical or emotional stresses borne by H. The now lengthy rupture in the gradually increasing visitations of H and her father, the apparent object of the trial court's 1987 rulings, seems to change the practical picture facing the court. The Fourth Circuit has recently handed down a decision in a related jury trial proceeding between the parties in the Virginia federal courts holding that the district court had erroneously refused to admit certain evidence probative of possible abuse by Foretich both of H and of another daughter. *Morgan v. Foretich,* 846 F.2d 941 (4th Cir.1988). The relevance if any, of that decision and of the other matters mentioned above to further proceedings in the case in our jurisdiction, including a possible reopening of hearings, remains for consideration by the trial court.[19]

Probably neither our courts nor any courts anywhere in the world can deal in a perfect way with matters so intimately linked to a family unit formed and dissolved. We can but try. The little girl H grows older day by day. It is she, first and foremost, to whom the courts must seek to render justice as the process moves on.

That portion of the order below forfeiting Morgan's security is reversed. In all other respects, the orders appealed from are affirmed.

SO ORDERED.

---

**19.** See notes 3, 9 and 12, *supra.* It is a valid question what, if anything, further should or can effectively be done as long as H remains secreted in defiance of court order.