Jean Elizabeth MORGAN, Appellant,

v.

Eric A. FORETICH, Appellee.

No. 88–1599.

District of Columbia Court of Appeals.

Argued May 24, 1989.*
Decided Aug. 21, 1989.
Order Vacating Opinions Aug. 21, 1989.
Judgment Sept. 25, 1989.

Stephen H. Sachs, with whom Juanita A. Crowley, Adrian N. Roe, John Vanderstar, Lyle Jeffrey Pash, and G. Allen Dale, Washington, D.C., were on the brief, for appellant.

Elaine Mittleman, Falls Church, Va., for appellee.

Frederick D. Cooke, Jr., Corp. Counsel at the time the memorandum was filed, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Deputy Corp. Counsel, Washington, D.C., submitted a memorandum as Friend of the Court.

Before MACK, FERREN, and BELSON, Associate Judges.

FERREN, Associate Judge:

In this unfortunate dispute over child custody and visitation, Dr. Jean Elizabeth Morgan has hidden her minor daughter from the court and from the child's father, Morgan's former husband, Dr. Eric A. Foretich. As a consequence, Morgan has been in jail for over twenty-three months—since August 28, 1987—for civil contempt of court. She appeals from a trial court order of December 16, 1988, denying her motion for release (filed September 22, 1988). Morgan does not seek to relitigate this court's ruling that her confinement for contempt initially was lawful. *See Morgan v. Foretich,* 546 A.2d 407 (D.C.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 790, 102 L.Ed.2d 781 (1989) (*Morgan III*). But she argued in the trial court, and stresses again on appeal, that her continued confine-

---

* This court remanded the record, received supplemental findings from the trial court on June 19, 1989, and received supplemental briefs from the parties on June 26, 1989.

ment violates her right to due process under the fifth amendment.

More specifically, Morgan contends that although jailing for civil contempt is a legitimate, coercive measure, it becomes punitive once there is no realistic possibility that it will induce compliance with a court order. Morgan stresses that she will never comply with the court's order to produce her child because she is determined to protect the child from Foretich, who Morgan claims has sexually abused their daughter. Morgan argues that her incarceration, accordingly, has become punitive, and that further punishment for hiding her child can be justified only if she is duly convicted of criminal contempt or some other crime.

The trial court, after hearings and oral argument, agreed with Morgan's understanding of the law but denied the motion, concluding on December 15, 1988, that despite incarceration for sixteen months, Morgan had not sustained her burden to show there was no "realistic possibility or substantial likelihood" that continued confinement would cause her to surrender her daughter. After oral argument on Morgan's expedited appeal, we remanded the record on May 26, 1989, for supplemental findings and conclusions "based solely on relevant facts and circumstances occurring in the period after December 15, 1988." The trial court on June 19, 1989, after further hearings and oral argument, again concluded that Morgan's incarceration for civil contempt was still properly coercive, not punitive—that Morgan again had failed to carry her burden to show that, despite incarceration, "there is no reasonable possibility of compliance with the outstanding order to produce her child."

We have reviewed the record, including the trial court's findings and conclusions of December 16, 1988, and June 19, 1989. We conclude the trial court's rulings are not supported by the record. We therefore must reverse and remand with an order to release Morgan from confinement.

In doing so, we recognize that the child's best interests—while ultimately the controlling issue in the domestic relations proceeding over custody and visitation—cannot be the governing consideration in a civil contempt case that arises out of such a proceeding. Nor is vindication of the trial court's authority ultimately at stake here. Important as these concerns are—and we believe that few can be more important in a society with laws intended to protect children from abusive parents—there is another concern that must prevail in this particular proceeding: due process of law. Irrespective of context, once the civil contempt power is shown to have failed in its intended purpose—and that failure is manifest on this record—the court must release the contemnor from jail. The trial court and the prosecuting authorities, however, are not without recourse. They may turn to criminal sanctions for anyone, such as Morgan, who has taken the law into her own hands. The court, for example, may initiate a proceeding for criminal contempt subject to the right to a jury trial before incarceration may be ordered for a term exceeding six months.

We elaborate our ruling below.

I.

In late 1984, the trial court awarded Morgan custody of her minor daughter and ordered liberal visitation rights for Foretich. In early 1985, Morgan alleged that Foretich was sexually abusing the child. In November 1985, the trial court held hearings on these allegations and related motions by both parties in connection with custody and visitation. In December 1985, the court denied all the motions except for a minor change in Foretich's visitation rights. In February 1986, Morgan began to deny Foretich the right to visit his child. In response to more motions, the trial court concluded in July 1986 that Morgan had failed to prove by a preponderance of the evidence that Foretich was sexually abusing the child. The court held Morgan in contempt of court for refusing to allow the visitation and issued an order of incarceration that was stayed pending appeal. After resolution of the issues on appeal, including affirmance of the judgment of contempt, Morgan was briefly incarcerated, then released. Thereafter, Foretich's visi-

tations resumed. On August 19, 1987, the court ordered a two-week, unsupervised visitation of the child with Foretich beginning August 22. This court denied Morgan's motion for stay of that order pending appeal. On August 22, 1987, Morgan refused to make the child available for visitation. On August 26, 1987, the trial court held Morgan in contempt once again and ordered her incarcerated effective August 28, unless and until she either delivered the child to Foretich or to the court's social services division.[1]

Thirteen months later, on September 22, 1988, Morgan filed a petition for writ of habeas corpus, D.C.Code § 16–1901 (1981), in the Superior Court, naming as defendants Morgan's jailers, William Plaut and Hallem Williams. Morgan argued that because she would never comply with the court order, the coercive purpose of civil contempt could not be served and, therefore, that her continued incarceration violated her right to due process. On November 8, 1988, the trial court, over Morgan's objection, ordered merger of the habeas petition into the domestic relations proceeding, deeming the petition to be a motion for relief from the order of civil contempt. The court also ordered Morgan to serve Foretich with the habeas petition and to add Messrs. Plaut and Williams as defendants in the domestic relations proceeding solely on the issue of the incarceration.

On December 13, 1988, the trial court held a hearing on Morgan's motion for relief from the order of civil contempt. At that hearing, Morgan testified that she refused to comply with the court's orders because she believed that Foretich had sexually abused their child. She explained the basis for her belief, which included statements by the child, Morgan's own observations, and opinions by lay persons and professionals who had interacted with the child. Morgan described her jail cell and her adjustment to prison life. She added that she was sustained in prison by the support of members of the community and of other inmates. Morgan acknowledged that she knew she could purge her contempt either by returning the child to Foretich or, short of that, by returning the child to the jurisdiction of the court. Morgan testified, however, that she would not comply with either of these options—that she believed going to jail was the only route available to protect her daughter. Three other witnesses testified on Morgan's behalf. The Reverend Caroline Pyle, Morgan's priest, Dr. Carol Kleinman, a psychiatrist, and the Honorable Paul Michel, Morgan's fiance, all testified about Morgan's adjustment to prison life and about her resolve to stay in jail as long as she believes necessary to protect the child. Foretich did not offer any evidence.

On December 15, 1988, the trial court issued an oral opinion denying the motion because Morgan had failed to show that "there is no realistic possibility or substantial likelihood that her continued confinement will cause her to relent" and, further, had failed to show that "Dr. Morgan's con-

---

1. The procedural history of this case is detailed in three published opinions of this court. The first, *Morgan v. Foretich*, 521 A.2d 248 (D.C. 1987) (*Morgan I*), concerned the 1986 order incarcerating Morgan for civil contempt. We held that civil contemnors have a qualified right to a public proceeding before being incarcerated. We remanded the record to the trial court to articulate the basis for closing the hearing, as well as to determine whether the best interests and privacy rights of the child, coupled with the reputational or other interests of the opponents of the open hearing, outweighed Morgan's and the public's right to a public hearing.

In *Morgan v. Foretich*, 528 A.2d 425 (D.C. 1987) (*Morgan II*), we reviewed the trial court's findings in response to this court's remand order in *Morgan I* and affirmed the trial court's closure of the hearing. We also addressed the other issues held in abeyance pending the remand. We affirmed the 1986 judgment of contempt as well as the trial court's conclusion that Morgan had not shown by a preponderance of the evidence that Foretich had abused the child.

In *Morgan v. Foretich*, 546 A.2d 407 (D.C. 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 790, 102 L.Ed.2d 781 (1989) (*Morgan III*), we affirmed the 1987 judgment of civil contempt and order of incarceration that underlie the present appeal. In doing so, we concluded that the record supported the trial court's determination that Morgan had not proved Foretich had abused the child and, consequently, that the court had not abused its discretion in ordering the child's two-week visitation with Foretich. We rejected Morgan's other contentions, except for reversing the court-ordered forfeiture of Morgan's security bond.

finement no longer serves a coercive purpose and is now wholly punitive in nature in violation of her constitutional rights." The trial court gave several reasons for this conclusion: the recent denial of relief by this court and by the federal courts, the likelihood that Morgan's friends and supporters may desert her, the fact that Morgan increasingly will miss her child, and the probability that Morgan will realize the waste of her professional talents—all causing her to relent and produce the child.

Morgan filed a timely appeal. After oral argument, we remanded for additional findings and conclusions based solely on relevant facts and circumstances since the December 1988 hearing. In response, the trial court held additional hearings in June 1989, and, on June 19, once again, denied Morgan's motion. The court reiterated its concern about the child's welfare. The court then noted Morgan's "public and litigation position" that she would never deliver the child to Foretich and added that Morgan had "avoided discussion" of her other alternative: she could purge her contempt by returning the child to the court's division of social services or to the District of Columbia's Department of Human Services (DHS). The court also emphasized that the child would not be placed with either parent on her return but would be initially evaluated by a team of experts.

The court then found: "It is unlikely that continued incarceration will cause Dr. Morgan to deliver the child directly to Dr. Foretich at any time within the foreseeable future if for no other reason than Dr. Morgan's personal pride." Based on its decision not to turn over the child initially to Foretich upon her return, the trial court stated that this alternative "is no longer before the court." The court then concluded that if this alternative "were the only issue, this court would order [Morgan's] immediate release." The trial court further found, however, that because Morgan had not addressed her second alternative— returning the child to the court's social services division or to DHS—she still had not sustained her burden to show there was no "reasonable" possibility that incarceration would lead to compliance with the

outstanding court order to produce her child. Therefore, said the court, the "remedial end sought to be achieved by [Morgan's] incarceration as it exists is still viable."

## II.

### A.

Incarceration upon a finding of civil contempt is a remedial measure designed to enforce compliance with a court order. *See Shillitani v. United States*, 384 U.S. 364, 368, 86 S.Ct. 1531, 1534, 16 L.Ed.2d 622 (1966); *D.D. v. M.T.*, 550 A.2d 37, 43 (D.C. 1988). A contemnor may purge herself of contempt and obtain release from jail at any time by complying with that order. *See D.D.*, 550 A.2d at 44; *In re Grand Jury Investigation*, 600 F.2d 420, 423 (3d Cir.1979). This control over one's imprisonment distinguishes a civil contempt proceeding from a criminal proceeding and, accordingly, justifies the state's power to incarcerate without affording the usual safeguards of indictment and jury. *Shillitani*, 384 U.S. at 370–71, 86 S.Ct. at 1535–36. Once it becomes clear, however, that incarceration will not coerce compliance, the rationale for the imprisonment ceases— its character changes from remedial to punitive—and due process requires the contemnor's release. *See In re Crededio*, 759 F.2d 589, 590 (7th Cir.1985); *Simkin v. United States*, 715 F.2d 34, 36–37 (2d Cir. 1983); *Soobzokov v. CBS, Inc.*, 642 F.2d 28, 31 (2d Cir.1981); *Lambert v. Montana*, 545 F.2d 87, 89–90 (9th Cir.1976).

The test to determine whether the confinement no longer is coercive is whether the contemnor has shown there is no "realistic possibility" or "substantial likelihood" that continued confinement will accomplish its coercive purpose. *See, e.g., Simkin*, 715 F.2d at 37, 38; *Grand Jury Investigation*, 600 F.2d at 425; *In re Farr*, 36 Cal.App.3d 577, 584, 111 Cal.Rptr. 649, 654 (2d Dist.1974); *Catena v. Seidl*, 65 N.J. 257, 262, 321 A.2d 225, 228 (1974) (*Catena I*). Determining whether incarceration no longer is coercive, and thus has become punitive, is not an easy task. Resolution of

this question is "inevitably far more speculative than [the] resolution of traditional factual issues" because "a prediction is involved and ... that prediction concerns such uncertain matters as the likely effect of continued confinement upon a particular individual...." *Simkin*, 715 F.2d at 38; *see In re Parrish*, 782 F.2d 325, 327 (2d Cir.1986).

■ "The contemnor may conscientiously believe at the time he [or she] testifies that incarceration will not coerce ... compliance," but that prediction may be "altered by continued confinement." *Parrish*, 782 F.2d at 327, 328. It follows that, although the contemnor's testimony that he or she will not comply is relevant to the trial court's determination, the trial court need not accept the contemnor's testimony as conclusive. *See Crededio*, 759 F.2d at 592–93; *Sanchez v. United States*, 725 F.2d 29, 31 (2d Cir.1984); *Simkin*, 715 F.2d at 37; *Grand Jury Investigation*, 600 F.2d at 425; *King v. Dep't of Social & Health Servs.*, 110 Wash.2d 793, 802, 756 P.2d 1303, 1309–10 (1988) (en banc). Other factors, while none is determinative, are also relevant, such as the age and health of the contemnor, *see Grand Jury Investigation*, 600 F.2d at 425; *Catena v. Seidl*, 68 N.J. 224, 228, 343 A.2d 744, 747 (1975) (*Catena II*), the length of incarceration, *see Grand Jury Investigation*, 600 F.2d at 425; *Catena II*, 68 N.J. at 228, 343 A.2d at 747, and the contemnor's own stated reasons for refusing to comply, *see, e.g. In re Ford*, 615 F.Supp. 259, 261–62 (S.D.N.Y. 1985); *In re Thomas*, 614 F.Supp. 983, 984 (S.D.N.Y.1985).[2] Even these other factors, however, may not provide a clear indication whether there is no realistic possibility that continued incarceration will coerce compliance with the court's order. *See Grand Jury Investigation*, 600 F.2d at 425.

Given the predictive nature of the inquiry, it is hard enough for the trial court to make a sound judgment. In most circumstances, therefore, it is likely to be even harder for appellate judges, who have not observed the contemnor testify, to assess the likelihood of compliance with the trial court's order. The critical issue at the outset, therefore, is our standard for reviewing the trial court's ruling. *See generally United States v. Felder*, 548 A.2d 57, 60–65 (D.C.1988) (discussing standards for reviewing questions of fact, questions of law, mixed questions of fact and law, and matters committed to trial court discretion).

### B.

Not all appellate courts have been careful to discuss the standards for reviewing trial court rulings on the effect of continued incarceration on civil contemnors. Some courts have addressed the critical distinction between coercive and punitive incarceration without indicating whether a constitutional question is at issue or not. *See Catena II; Catena I; King*. Others have acknowledged that due process or cruel and unusual punishment may be at issue but have failed to analyze whether a constitutional inquiry affects the degree of deference to be accorded the trial court's own analysis. *See Crededio* (due process); *Farr* (cruel and unusual punishment). Still other courts have stated or implied that, when the federal statute fixing a ceiling on incarceration for civil contempt for refusing to testify before a grand jury (usually eighteen months) is involved, *see* 28 U.S.C. § 1826(a) (1982), due process con-

---

2. In *King*, 110 Wash.2d at 804, 756 P.2d at 1310, which concerned incarceration of a father for refusal to bring a young son to a dependency hearing, the court said "the physical safety and well-being of a minor child may be endangered by Mr. King's continued defiance of the court order. It is an example of the kind of factors the court should weigh in deciding whether to continue or terminate incarceration for civil contempt." We must disagree. The point is to identify factors that could cause a contemnor to relent. If the contemnor is satisfied either that the child is better off (*Morgan*), or that the contemnor is better off (*King*), when the child is kept in seclusion, then we do not understand how extending the contemnor's imprisonment will cause the contemnor to relent. Although a child's well-being is of tremendous concern, incarceration of the contemnor for the sake of the child when the contemnor has a strong incentive to keep the child away from the court (and therefore will not comply with the court order) is for all practical purposes punishment of the contemnor, not coercion.

cerns do not arise until incarceration exceeds the statutory maximum. *See Sanchez,* 725 F.2d at 31; *Simkin,* 715 F.2d at 37; *Grand Jury Investigation,* 600 F.2d at 427 & n. 26. These courts have reasoned that Congress has attempted to draw the line between coercion and punishment, that this line is not unreasonable, and that the courts, accordingly, should not substitute their judgment by drawing "finer lines than Congress has already drawn...." *See Grand Jury Investigation,* 600 F.2d at 427.

In operating from the premise that, when 26 U.S.C. § 1826(a) is applicable, due process concerns do not arise until eighteen months of imprisonment have passed, these federal courts have adopted an abuse-of-discretion standard of review for the period up to eighteen months. *Sanchez,* 725 F.2d at 31; *Simkin,* 715 F.2d at 37; *Grand Jury Investigation,* 600 F.2d at 428. *See also Parrish,* 782 F.2d at 328 (no abuse of trial court discretion to release civil contemnor from prison after seven months).[3] We do not confront a statutory ceiling in this case, however. Congress has not defined a period of time within which incarceration for civil contempt of the District of Columbia courts arguably does not evoke concerns about due process.

We therefore need not decide the question whether there lawfully can be a period of incarceration for civil contempt immune from a due process attack. But, even if such a period were permissible, we are satisfied that Morgan's incarceration for 23 months—5 months longer than a congressionally-imposed ceiling in another context—has been sufficiently long to require us to address the fifth amendment issue. We agree with the United States Court of Appeals for the Ninth Circuit: "Where it is alleged that the duration of an individual's confinement no longer bears a reasonable relationship to the purpose for which he [or she] is committed a substantial federal constitutional claim relating to denial of due process is present." *Lambert,* 545 F.2d at 89 (citing *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *McNeil v. Director, Patuxent Inst.,* 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972)). In short, under the circumstances of this case, absent a legislatively-created presumption against a denial of due process during a particular time frame for incarceration, the question whether Morgan's incarceration for civil contempt is no longer coercive, but punitive, presents a substantial constitutional concern.

Given this constitutional concern, we do not confront a situation, as in *Sanchez, Simkin,* and *Grand Jury Investigation,* where the determination whether a remedial incarceration has become punitive is committed to the trial court's sound discretion, reversible only for abuse of discretion.[4] Trial court discretion implies the " 'right to be wrong without incurring reversal,' " *Johnson v. United States,* 398 A.2d 354, 367 (D.C.1979) (citation omitted); a discretionary ruling "does not 'inevitably' lead to only one acceptable result." *Wright v. United States,* 508 A.2d 915, 920 (D.C.1986) (citing *Johnson,* 398 A.2d at 363–64)). A sustainable discretionary ruling, therefore, is not unquestionably correct; it is simply not demonstrably incorrect. It "requires the appellate court to assure itself only that certain 'indicia of rationality and fairness' have been met." *Felder,* 548 A.2d at 62 (citing *Johnson,* 398 A.2d at 362). In contrast, our review of an alleged violation of due process cannot tolerate a range of acceptable results, including one or more that may be "wrong." As

---

3. At least one court, in a case where no statutory ceiling on incarceration for civil contempt was involved, relied on *Simkin* and *Grand Jury Investigation* to adopt an abuse-of-discretion standard without recognizing a possible constitutional limitation. *See King,* 110 Wash.2d at 802–805, 756 P.2d at 1309, 1310.

4. We have said that the trial court's decision whether to hold a party in civil contempt "will be reversed on appeal only upon a clear showing of abuse of discretion." *D.D. v. M.T.,* 550 A.2d 37, 44 (D.C.1988) (citing *In re Ollie Bryant,* 542 A.2d 1216 (D.C.1988)). The decision to hold a party litigant in contempt initially, however, is quite different from the constitutional question whether continued incarceration of the contemnor violates due process once there is no realistic possibility that incarceration will induce compliance.

to constitutional issues, therefore, we review for trial court error (with appropriate deference to the trial court's fact-finding role) with a view to "only one possible outcome." *Wright*, 508 A.2d at 920.[5]

### C.

In reviewing for trial court error when a case is tried without a jury, we may set aside the court's order for errors of law but may not reverse for factual errors unless the court's findings are "plainly wrong" or "without evidence to support" them. D.C.Code § 17–305(a) (1981). This means that, even in reviewing for errors of law, we must defer to the trial court's findings of fact unless they are "clearly erroneous," Super.Ct.Civ.R. 52(a), or "unsupported by the record."[6]

We therefore confront the issue whether the trial court's determination—that Dr. Morgan has failed to carry her burden to show there is no realistic possibility or substantial likelihood that continued incarceration will cause her to surrender her daughter—is a question of fact or of law.[7] This outcome-determinative question may at first appear to be a factual inquiry, involving as it does a particularized determination about the circumstances relevant to one contemnor. *See Simkin*, 715 F.2d at 37. However, in other instances of seemingly factual determinations about particular individuals, such as whether an act was "voluntary" or a person was "seized" or "arrested," these ultimate issues are deemed questions of law, especially because the answer implicates a constitutional right.[8] Conceptually, perhaps, these is-

---

**5.** One federal court not considering due process limitations has written that, "[s]ince a prediction is involved," in contrast with the "resolution of traditional factual issues," the trial judge has "virtually unreviewable discretion both as to the procedure he [or she] will use to reach [the] conclusion, and as to the merits of [the] conclusion" about continued incarceration. *Simkin*, 715 F.2d at 38. We must emphasize, however, that this appellate court was speaking from the relatively comfortable position of administering an abuse-of-discretion standard of review. While it may be true that an appellate court is not well positioned to second-guess a trial court's perceptions about the continuing coercive power of incarceration on a particular contemnor, we are also aware that this very difficulty cannot justify permitting a trial court to escape review altogether, especially when the issue is of constitutional dimension. We cannot settle for a "virtually unreviewable" exercise of trial court discretion when due process of law is at stake.

**6.** We have interpreted D.C.Code § 17–305(a) (1981) to mean that the findings of fact by the trial court, when sitting without a jury, are "presumptively correct unless they are clearly erroneous or unsupported by the record." *Auxier v. Kraisel*, 466 A.2d 416, 418 (D.C.1983); *see also Bell v. Jones*, 523 A.2d 982, 992 (D.C.1986); *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 546–47 (D.C.1981). The Supreme Court has said: "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). *See also Bose Corp. v. Consumers Union of United States, Inc.*,

466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984).

**7.** Sometimes a case presents so-called mixed questions of fact and law. These are "questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard or to put it another way, whether the rule of law as applied to the established facts is or is not violated." *Pullman–Standard v. Swint*, 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 1790 n. 19, 72 L.Ed.2d 66 (1982). Such mixed questions are sometimes reviewed, ultimately, as questions of fact but, more often, as questions of law. *Felder*, 548 A.2d at 61–62. Commonly, however, the court engages "in some measure of unmixing, whereby subsidiary, fact-like issues, are reviewed under the 'clearly erroneous' standard, and the ultimate, law-like issue, is reviewed 'de novo.'" *Id.* at 62.

**8.** *See Ruffin v. United States*, 524 A.2d 685, 691 (D.C.1987) (question whether suspect voluntarily accompanied police to headquarters, or was arrested in violation of fourth amendment, is question of law for appellate court, with deference due trial court's resolution of conflicting testimony), *cert. denied,* —— U.S. ——, 108 S.Ct. 2827, 100 L.Ed.2d 927 (1988); *Hawthorne v. United States*, 504 A.2d 580, 586 (D.C.1986) (question whether confession, under totality of circumstances, was voluntary is question of law which appellate court must resolve independently while deferring to trial court's findings of facts on issue of voluntariness), *cert. denied,* 479 U.S. 992, 107 S.Ct. 593, 93 L.Ed.2d 594 (1986); *Gayden v. United States*, 492 A.2d 868, 872 (1985) (question whether suspect was seized within meaning of fourth amendment is question of law for court while giving due deference to trial court's findings of fact).

sues are best characterized as mixed questions of fact and law. *See supra* note 7. In these instances, too, we defer to the trial court's resolution of the underlying factual issues (unless clearly erroneous),[9] but in applying the correct legal standard to these subsidiary facts we say we are answering a question of law.

In the present case, as it turns out, we need not decide whether the trial court's ultimate determination resolves a question of fact or of law or a mixed question of fact and law. Even if it were best characterized as a question of "ultimate fact"[10] that may not be set aside unless "clearly erroneous" or "unsupported by the record," *see* D.C.Code § 17–305(a); Super. Cit.Civ.R. 52(a), *supra* note 6,[11] we would have to reverse because, as elaborated be-

low, several of the subsidiary facts found by the trial court are themselves unsupported by the record and thus do not support the court's ultimate ruling. In such circumstances, after setting aside the unsupported findings, the appellate court itself may decide the case upon the entire record. *See Dayton Bd. of Educ. v. Brinkman,* 443 U.S. 526, 534–37, 539–40, 99 S.Ct. 2971, 2977–79, 2980, 61 L.Ed.2d 720 (1979); *United States v. United States Gypsum Co.,* 333 U.S. 364, 394–99, 68 S.Ct. 525, 541–44, 92 L.Ed. 746 (1948); *cf. United States v. Shakur,* 817 F.2d 189, 197 (2d Cir.) (in reviewing trial court finding under Bail Reform Act of 1984 that conditions could be imposed that reasonably would assure defendant's presence at trial, appellate court may weigh record evidence itself

9. *See Hawthorne,* 504 A.2d at 586 (deference to trial court's findings of fact on issue of "voluntariness" where they have substantial support in the record); *Gayden,* 492 A.2d at 872 (deference to trial court findings of fact in deciding whether suspect was "seized" within meaning of fourth amendment); *United States v. Zannino,* 798 F.2d 544, 546 (1st Cir.1986) (deference to trial court's underlying findings of fact when determining de novo question whether pretrial detention exceeded regulatory purpose and had become punitive).

10. One court has described as an "ultimate fact" the *determination whether there is a substantial* likelihood the contemnor's continued confinement will result in compliance with the court's order. The court did not indicate whether this terminology was intended to mean that the question was a wholly factual one, limiting appellate review. *See Farr,* 36 Cal.App.3d at 584, 111 Cal.Rptr. at 654.

11. Appellate courts occasionally have to resolve whether particular findings that determine the outcome of the litigation are "ultimate facts," subject to the clearly erroneous test of Super.Ct. Civ.R. 52(a), *see Pullman–Standard,* 456 U.S. at 288, 102 S.Ct. at 1790 (issue of "intention to discriminate because of race" under Title VII of Civil Rights Act of 1964 is "pure question of fact, subject to Rule 52(a)'s clearly erroneous standard"), or are questions of law for the reviewing court, *see Bose Corp.,* 466 U.S. at 511, 104 S.Ct. at 1965 (in product disparagement case, issue of "actual malice" in first amendment defense under *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), is question of law). The Supreme Court has noted that the distinction between questions of fact and of law "is often not an illuminating test and is never self-executing." *Baumgartner v. United States,* 322 U.S. 665, 671, 64 S.Ct. 1240, 1244, 88 L.Ed.

1525 (1944). Indeed, no rule or principle "will unerringly distinguish a factual finding from a legal conclusion." *Pullman–Standard,* 456 U.S. at 288, 102 S.Ct. at 1790. It is more likely that an outcome-determinative finding will be deemed a question of law when a constitutional issue is presented. *See, e.g., Bose Corp.; see generally* Monaghan, *Constitutional Fact Review,* 85 Col.lum.L.Rlv. 229 (1985). The Court recently has noted, however, that "no broader review is authorized ... simply because [it] is a constitutional case, or because the factual findings at issue may determine the outcome of the case." *Maine v. Taylor,* 477 U.S. 131, 145, 106 S.Ct. 2440, 2451, 91 L.Ed.2d 110 (1986) (court of appeals erred in setting aside district court's findings that Maine's ban on importation of live baitfish satisfies requirements of *Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979), and thus does not violate Commerce Clause).

All this said, we note that in at least one context similar to the one we confront here—whether the duration of pretrial detention without bail has exceeded constitutional limits—the United States Court of Appeals for the First Circuit made "a de novo determination—with deference to the district court's underlying findings of fact...." *United States v. Zannino,* 798 F.2d 544, 546 (1st Cir.1986); *accord, United States v. Gonzales Claudio,* 806 F.2d 334, 343 (2d Cir.1986) (appellate court must apply "broader standard of review" than clearly erroneous test since district court's findings "have significance on the constitutional issue of whether continued detention violates due process limitations"). *Zannino* and *Gonzales Claudio* can best be characterized as rulings on mixed questions of fact and law, *see supra* note 7, with the ultimate determination being one of law for the appellate court.

if trial court relied primarily on factor or factors not specified by Congress for evaluating defendant's propensity to flee), *cert. denied*, 484 U.S. 840, 108 S.Ct. 128, 98 L.Ed.2d 85 (1987).

## III.

We turn to the merits. In the second set of findings, dated June 19, 1989, after Morgan had been incarcerated for twenty-two months, the trial court reviewed the evidence of Morgan's stated intentions not to comply with its order, as well as her reasons for refusing to comply and her adjustment to conditions in the jail. The court correctly noted that it was not required to accept Morgan's avowed intention never to comply with the court order. *See, e.g., Crededio*, 759 F.2d at 592–93; *Sanchez*, 725 F.2d at 31. The court then found, however, that it "is unlikely that continued incarceration will cause Dr. Morgan to deliver the child directly to Dr. Foretich at any time within the foreseeable future, if for no other reason than Dr. Morgan's personal pride." The court added that if this were the only way in which Morgan could purge the contempt, the court would order her immediate release.

The court also went on to find, however, that "[n]o evidence of an unambiguous nature has been presented that Morgan will not produce her child to court social services or the Department of Human Services" —Morgan's second alternative for purging her contempt. Based on this finding, the trial court concluded that the remedial purposes of incarceration could still be served and that the motion for relief from confinement should accordingly be denied. The record does not support this conclusion.

### A.

First, we find unsupported by the record most of the reasons the trial court gave in December 1988 for disbelieving Morgan's testimony that she would not comply with the court's August 1987 order. In this set of findings, the trial court gave four reasons for concluding—sixteen months after

Morgan had gone to jail—that "coercion had just begun": Morgan was just beginning to feel the impact of litigation losses in this court and in the federal courts; her friends and supporters might desert her; she would come to regret abandoning her medical practice; and she would miss her daughter too much to stay in jail. We will not second-guess the trial court's perception about the impact of Morgan's litigation losses; but, this finding by itself is clearly insufficient to support the trial court's conclusion, and we see no record basis for the other three findings, which were not derived from discernible evidence and thus were speculative. The record reflects that Morgan's community support system was strong in December 1988; that she had closed her medical practice by December 1988 and, according to friends and acquaintances, appeared to be at peace about it; and that her claim that her daughter is in danger cuts in favor of Morgan's announced intention to remain incarcerated rather than comply with the court's order.

Even if the court's findings were supportable at the time of the first hearing, the additional six months of incarceration, coupled with the testimony of Morgan and others at the June 1989 hearing, give rise to solid inferences that three of the court's four reasons for believing continued incarceration will cause Morgan to relent are simply not sustainable now. Morgan shows no signs of yielding to pressure on account of missing her daughter or her medical practice, and the trial court itself found that Morgan's community support system had increased by June 1989, not fallen off.[12] Furthermore, in its supplementary ruling of June 19, 1989, the trial court mentioned none of these reasons. This presents a problem. In its December 1988 order, the trial court did not differentiate between the likelihood of Morgan's acceding to one or the other of her two alternatives for complying with the court's 1987 order if incarceration were to continue. The trial court's reasons for believing at the time that Morgan might comply with

---

**12.** In its June 1989 findings, the trial court found that "the membership in [Morgan's] support group has increased from just over 1,000 to over 5,000."

the order, therefore, apparently applied equally to either alternative. During the past six months something has changed, for the trial court now believes that Morgan will never deliver the child to Foretich; and yet, except for referring to Morgan's "personal pride," the trial court did not explain this conclusion. Given the terms of our remand, however, we must assume the trial court intends its previous findings to remain in force, absent modification. Thus, we must assume the trial court still believes they reflect sufficiently powerful pressure to coerce Morgan's compliance with the second alternative.

Neither the trial court nor this court is obliged to believe Morgan, but because the reasons on which the trial court relied for discounting Morgan's resolve six months ago are no longer strong enough to overcome Morgan's refusal, as a matter of "personal pride," to turn the child over to Foretich, and because three of the four reasons are no longer operative in any event (if they ever were), we are hard pressed to sustain the trial court's rejection of Morgan's testimony that she will comply with no part of the court order, including her second option.

B.

In December 1988, Morgan testified that she equated the two alternatives for purging her contempt because she believed turning the child over to the court was tantamount to turning her over to Foretich. We therefore address, more specifically, the trial court's June 1989 finding that Morgan failed to demonstrate there is no realistic possibility, if incarceration continues, that Morgan will elect to free herself by exercising her option to turn her child over to a designated social service agency.

As the trial court's supplemental findings make clear, two alternative methods of purging the contempt have been available to Morgan since she was jailed in August 1987. In fact, the trial court conducted a hearing on September 11, 1987, to make sure that Morgan fully understood these two options. It may be true, as the trial court stated in its June 1989 findings,

that Morgan has emphasized to the public and to the court that she would never deliver the child to Foretich. It may also be true that, to sustain public support for her position, Morgan has deliberately avoided public discussion of her option to turn the child over to one of the designated social service agencies. But Morgan testified at the December 13, 1988, hearing that she clearly understands her two options; that she equates the two because of the risk that unconditionally turning the child over to the court will result in eventually turning the child over to Foretich; and that she will therefore not produce the child as required.

In light of Morgan's testimony, we see two problems with the trial court's June 1989 finding. In the first place, the court found "[n]o evidence of an unambiguous nature ... that Morgan will not produce her child to court social services or the Department of Human Services." But the only basis we can see for this finding is the court's statement that it had "experienced an obvious degree of difficulty in determining whether Dr. Morgan objected to the child having supervised visitation by her father ... [;] it appears that she wanted to avoid saying 'yes,' 'no,' or 'I don't know.'" These two issues are not the same; and, in any event, contrary to the trial court's indication, we observe that Dr. Morgan's position concerning supervised visitation by Dr. Foretich is consistently stated and crystal clear from the hearing record.

It is true that in June 1989, in response to the court's questions, Morgan did testify that she might agree to her daughter's supervised visitation with Foretich *if* Foretich admitted he had abused the child, *if* the child (now seven) was willing to visit with her father, and *if* such visitation was part of a therapy regime that Morgan considered "safe." But, at no time did Morgan even intimate, let alone testify, that she would turn the child over to the court's social services division or to DHS absent these conditions.

In finding that Morgan might do so if incarceration continued, the court did not advert to Morgan's testimony in December

1988 to the contrary. More importantly, the court inexplicably equated the issue of supervised visitation with the issue of turning the child over to court social services or to DHS. Morgan clearly does not equate these two issues, and, in the context of the questions asked at the June 1989 hearing, these issues potentially are quite different. Morgan has adamantly refused to return the child either to Foretich or to the jurisdiction of the court. While Morgan acknowledged the possibility of the child's supervised visitation with Foretich, with specified conditions, she was not speaking in the context of unconditional control by the court. Morgan's testimony does not suggest that she might exercise the option to purge her contempt by unconditionally surrendering her child to a designated public agency, thereby losing all control over the child's visitation. The court therefore had no record basis for finding Morgan might relent under her second option.

Second, the trial court's own findings support Morgan's announced fear of unconditionally turning the child over to a social services agency. They accordingly reinforce the inference that Morgan will continue to defy the 1987 trial court order. While the trial court has stated that the child, upon her return, would not initially be placed with either parent, the court has made clear that this decision will be in force only until the child has been "evaluated by a neutral team of appointed experts." This leaves open the possibility that the court, once again, could make the child available to Foretich, as well as to Morgan—a concern that Morgan has consistently expressed as the reason for refusing to surrender their child. That concern is corroborated, not alleviated, by the trial court's statement in a footnote to its June 1989 findings, calling it "not inconceivable

that appointed experts might initially recommend only supervised visits with either parent...." This statement implies that, to the trial court, unsupervised visits are also conceivable. And, in any event, it does not suggest the kind of supervised visits, on conditions, that Morgan said she might consider.[13]

### C.

■ Because the trial court itself has recognized on this record that there is no realistic possibility Morgan will deliver the child directly to Foretich, and because there is no record basis for concluding that Morgan has ever believed that unconditionally surrendering her child to a designated social services agency is a less troubling alternative, we are compelled by the record to conclude there is no realistic possibility or substantial likelihood that further incarceration will coerce Morgan into complying with the trial court's order to produce her child.

Although a court need not accept a contemnor's own testimony as a true predictor of her behavior, Morgan has steadfastly refused to comply with the court's order after twenty-three months of incarceration, has supplied clear reasons for doing so, has received increasing support from some members of the community to shore up her resolve, has dismantled her medical practice, has convinced friends and acquaintances that she will not yield, and has even convinced the trial court that she will not deliver the child to Foretich. We see no room for believing that further incarceration will coerce Morgan into delivering the child to the court social services division or to DHS; the trial court's reasons for so believing are based on erroneous analysis and otherwise find no factual support in the record.

---

13. We note another aspect of the court's supplemental findings that detracts from their cogency. The trial court noted that "Dr. Morgan bases her refusal to purge her contempt on her obligation to protect the child." The court then announced "that the welfare of the child is relevant to the issue of continued incarceration, at minimum, to the same extent Dr. Morgan bases her refusal to purge the contempt upon her obligation to protect the child." We do not know what this means. Because Morgan has said she will stay in jail until her child becomes age 18, in order to protect her, it would appear the trial court could mean that, for the child's welfare, the court will incarcerate Morgan for as long as she elects to stay there for the same reason. In any event, concerned as we are for the child's welfare, that factor is not relevant to the question whether the contemnor is likely to relent. *See supra* note 2.

We recognize that we necessarily are venturing into the elusive area of prediction, and, that, without the benefit of observing witness demeanor, we lack access to important data that the record cannot easily reflect, if at all. On the other hand, we do have a voluminous record that clearly reflects a consistent, convincing stand by Morgan that she will not budge. We are therefore convinced that Morgan's incarceration no longer can be said, after twenty-three months, to have a coercive effect. Due process requires her release from jail.[14]

In ordering Morgan's release, we do not condone her conduct and do not express any view on where the child's best interest lies—with Morgan, Foretich, both, or neither. Nor do we address the availability of other civil contempt remedies, such as a fine. Morgan's refusal to comply with the trial court's order, moreover, is subject to a properly lodged charge of criminal contempt, D.C.Code § 11–944 (1981), entitling her, however, to a jury trial, *see Bloom v. Illinois*, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968), if she would be subject to incarceration for more than six months, *see Baldwin v. New York*, 399 U.S. 66, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970). Moreover, other criminal sanctions may be available. Morgan's actions, for example, may amount to a violation of the Parental Kidnapping Prevention Act of 1985, D.C.Code §§ 16–1021 to 16–1026 (1988 Supp.) or its federal counterpart, 18 U.S.C. § 1073 (1982). The point is, however, that Morgan is entitled to due process of law. Judge Posner, dissenting in *Crededio* in another context, has well summarized our concern:

We should keep a bright line between civil and criminal contempt. Putting a person in prison for up to 18 months (which is almost as much time as the average federal criminal defendant serves who is sentenced to 5 years in prison), without a full trial, and with none of the safeguards of the criminal process, see 3 Wright, Federal Practice and Procedure: Criminal 2d § 705 (1982), is an anomaly in our system, and is permitted only when the purpose is not to punish for past miscreancy but to induce a specific act that the law has a right to coerce, in this case testifying before the grand jury. *See id.* § 704, at pp. 823–24. As soon as it is clear that the inducement won't work, the purpose of civil contempt lapses, and the continued imprisonment of the [person] becomes penal, and requires a criminal proceeding.

759 F.2d at 594. Furthermore, while we hold that Morgan must be released from jail, we share the trial court's concern about the welfare of the child. We assume the trial court will take whatever steps are available to find her, and we expect the appropriate executive agencies will assist as well since the courts do not have law enforcement resources at their disposal.

---

**14.** Contrary to appellee Foretich's suggestion, Chief Justice Rehnquist's weighing of interests in granting a stay pending appeal in *Baltimore Dep't of Social Servs. v. Bouknight*, —— U.S. ——, 109 S.Ct. 571, 572, 102 L.Ed.2d 682 (1988), is not relevant here. The case, *In re Maurice M.*, 314 Md. 391, 550 A.2d 1135 (1988), *cert. granted, Baltimore City Dep't of Social Servs. v. Bouknight*, —— U.S. ——, 109 S.Ct. 1636, 104 L.Ed.2d 152 (1989), concerns a mother, Bouknight, who was held in civil contempt and ordered incarcerated for refusing to produce her child. The child had been abused before, and the trial court feared the child would be abused again or might even be dead. The mother has refused to produce the child or to reveal the child's whereabouts, claiming the answer might incriminate her. The Maryland Court of Appeals held that the contempt order violated Bouknight's fifth amendment privilege against self-incrimination and vacated the order. Chief Justice Rehnquist, sitting as a Circuit Justice, granted a stay of the Maryland order on the ground that all four criteria in *Rostker v. Goldberg*, 448 U.S. 1306, 1308, 101 S.Ct. 1, 2, 65 L.Ed.2d 1098 (1979), were met. In particular, the Chief Justice concluded that the fifth amendment issue was an "important question" which the Court was likely to vote to hear and on which the Court had a "fair prospect" of reversing the state court. 109 S.Ct. at 572. He also noted that the equities favored a stay because, if Bouknight were freed, the state might not have an alternative means of finding and protecting the child. *Id. Bouknight* is irrelevant to the present case for two reasons: (1) Morgan has not asserted a fifth amendment privilege against self-incrimination as a reason for refusing to produce her child; and (2) in contrast with Morgan's position on appeal, Bouknight challenges her initial incarceration; Bouknight does not separately challenge her continued incarceration on due process grounds—a claim that, presumably, is still available to her.

Finally, although we are compelled to reverse the trial court's ruling, we note that the court has shown remarkable fortitude in the face of long and gruelling proceedings. We commend the court's efforts.

## IV.

We reverse the trial court's order denying Morgan's motion for relief from civil contempt and remand the case to the trial court for entry of an order to release Morgan from the District of Columbia jail.[15]

*So ordered.*

BELSON, Associate Judge, concurring:

I join in Judge Ferren's opinion. In doing so, I acknowledge that our dissenting colleague is undoubtedly correct that the best interests of the child are ultimately the central consideration in the underlying Family Division case. But granting that, we must consider how keeping Morgan in jail will serve the child's best interests. Incarceration will serve the best interests of the child only if there is some reasonable likelihood that it will coerce Morgan into producing the child. If incarceration at this time is no longer coercive in that sense, but rather has become merely punitive, then the child's best interests are not advanced at all by continued incarceration. Instead, further incarceration would likely be attended by a continuing stalemate[1] during which, as Judge Mack so aptly puts it, "[a] missing child in these proceedings divests a protecting court of the power to act." Dissent at 18.[2]

While it is difficult to accept the proposition that a purposeful litigant can effectively deprive the courts, even temporarily, of the power to adjudicate a matter entrusted to them under our system of laws, that difficulty does not alter the nature of civil contempt, nor does it warrant holding Morgan in jail any longer if her incarceration has become merely punitive. The law will simply have to turn to means other than Morgan's incarceration for civil contempt to attempt to secure the presence of the child and thus permit the completion of unresolved litigation concerning custody and visitation.

In this ruling today, the majority holds that, on this record, the trial court erred in finding that Morgan had failed to carry her burden of establishing that further incarceration holds out no realistic possibility of compelling her compliance with the order that the child be returned to the jurisdiction of the court. In other words, the trial judge's decision is not supported by the evidence of record.

As the cases cited by both Judge Ferren and Judge Mack make clear, a trial judge's prediction of what a human being is likely to do in the future is difficult to review at the appellate level; but under our judicial system, such review is called for, and the statute which governs this court's review of Superior Court proceedings tried without a jury provides for reversal of a trial judge's findings of fact if they are without support in the evidence of record. D.C. Code § 17–305 (1981).[3] I agree with Judge Ferren's analysis of the evidence.

15. Because we dispose of this appeal on other grounds, we need not reach Morgan's contention that the trial court erred in merging Morgan's petition for habeas corpus into the underlying domestic relations proceeding.

1. Any stalemate would be broken, despite Dr. Morgan's recalcitrance, if the child were produced through the efforts of law enforcement agencies; but so far as appears of record, no such efforts have been made. I join emphatically in Judge Ferren's expectations that agencies of the executive will assist in the court's efforts to produce the hidden child.

2. I emphasize that Judge Mack has referred to a "protecting court"; I also realize that Morgan has repeatedly faulted the trial court for failing

to protect the child. But Morgan is a partisan in this contested case, as is Foretich. It is true that Morgan has adduced evidence from which a factfinder could find that Foretich is not a fit custodian of the child and therefore should not be given custody. But there is also evidence that could lead the factfinder to have doubts about Morgan's fitness. This troubling conflict must be decided at the trial level, subject only to appropriate appellate review. Judge Dixon's view is certainly reasonable that the Family Division proceedings cannot be concluded until the child is returned.

3. While an appellate court is not frequently called upon to review trial court predictions of human behavior, the civil contempt context is

In this case, all indications are that Morgan will persist in her recalcitrance in the face of incarceration. The very fact that she has stayed in jail for almost two years strengthens the conclusion that she will not be coerced by further incarceration. For the above reasons, I join in Judge Ferren's opinion. I agree also with much of what Judge Mack has written, in particular her statements about the conduct of the parties leading up to Morgan's incarceration and her indication, similar to that of Judge Ferren, that the trial judge has dealt conscientiously with a most difficult case. I disagree, however, with the dissent's conclusion that the trial judge can make a purely discretionary decision as to whether the contemnor should be released. It is incumbent upon this court to review the entire record and to decide whether it supports the trial judge's ruling.

MACK, Associate Judge, dissenting:

Judge Ferren's opinion goes far to prove that the conclusion you reach depends on the issue you frame. His preoccupation with the due process rights of Dr. Elizabeth Morgan, unalloyed with any consideration of the other vital issues controlling this appeal, is myopic, and under the circumstances of this case, uncaring. It has prompted a majority decision[1] that restricts the discretion of the Superior Court in a most vital arena, and poses a conflict with the rationale, not only of the judicial precedents the majority purports to rely upon, but also of our own prior decisions in this case.

not the only situation in which an appellate court has that role. Another instance of such review is presented when the trial court sets conditions of pretrial release in a criminal proceeding. If, for example, the trial court grants release on the basis that the defendant is not likely to flee the jurisdiction, but relevant indications in the record are to the contrary, the appellate court may reverse the trial court's finding that the government has failed to carry its burden. *United States v. Shakur,* 817 F.2d 189 (2nd Cir.1987); *see also United States v. Motamedi,* 767 F.2d 1403 (9th Cir.1985) (reversing the trial court's predictive finding that the defendant is likely to flee the jurisdiction).

## I.

This case is about a missing child. It arose as a result of a custody action which is still pending in the Family Division. Dr. Morgan is in jail because she has hidden the child and because she refuses to reveal her whereabouts to the Family Division. At stake is the child's welfare, the court's power to effect orders based upon impartial findings, and the capacity of an interested party—whether right or wrong, accuser or accused—to circumvent the findings of a legally instituted, neutral arbiter and effect her will upon an innocent third party. Judge Ferren's position, therefore, that the child's best interests are irrelevant as against a constitutional claim of due process, is untenable.

The welfare of this missing child has been the primary concern of the Family Division since 1983, when the little girl was only nine months old, and the record before us reveals evidence justifying the grave concern voiced by the trial court for the current welfare of the child. In November 1984, Judge Bruce Mencher, in an exhaustive opinion evaluating the respective traits and personalities of the parents, as well as both sets of grandparents, granted custody rights to the mother and liberal visitation rights to the father (and sealed the record in "the best interest of the child"). The mother was described as having a deep and abiding love for the child and as having provided a nurturing environment. The court was impressed with the father's love and concern for his child, but found credible testimony that his life had been marred by a tenor of instability because of his many marital problems. Judge Mencher

1. Although Judge Belson says that he joins in Judge Ferren's opinion, I cannot read his statement as joining anything more than disposition—that is, that Dr. Morgan must be released simply because she will not obey a court order, a position we are not at liberty to take in view of *Morgan v. Foretich,* 528 A.2d 425 (D.C.1987) (*Morgan II*) and *D.D. v. M.T.,* 550 A.2d 37 (D.C. 1988). It is not clear to me, moreover, that he embraces Judge Ferren's holding that a child's best interest cannot be weighed against a constitutional claim of due process, nor how he could do so in view of established law.

took special pains to point out the contrast between the sets of grandparents—on the maternal side, restrained and emotionally sedate, "perhaps as a result of their emphasis on the importance of the more highly intellectual aspects of life," and on the paternal side, "warm, outgoing and openly emotional." Judge Mencher added that the child should have the opportunity to experience this beneficial contrast of personalities, that Dr. Morgan's one failure to act in the best interests of the child had been her intolerance toward visitation rights and her unwillingness to allow the father any significant role in bringing up the child, and, in a sage prediction, that "if such a pattern were to continue it could only result in detriment to the child."

In the months that preceded this ruling, and before the case was assigned by special order to Judge Dixon, at least eleven other Superior Court judges had handled numerous motions and issued orders with respect to visitation rights. One judge granted a motion for contempt against Dr. Morgan for refusing to comply with a consent order. As noted, certain aspects of the case are still pending in the trial court.

In the same vein, this court, faced with an avalanche of requests from Dr. Morgan for appellate relief (fifteen appeals and forty-nine motions, prompting, to date, the entry of sixty-seven orders and three written opinions), has kept the welfare of the child uppermost in its deliberations. We suggested the appointment of a guardian for the child, and as may have been expected, we reviewed with the strictest scrutiny every request for a stay of the monitored visitations ordered by the trial court, sometimes suggesting additional provisions to assure that under no circumstances would there be an opportunity for the abuse by then alleged by Dr. Morgan. After we had approved the trial court's rejection of Dr. Morgan's contention that Dr. Foretich had abused the child, *Morgan II, supra* note 1, 528 A.2d at 429, we refused to grant an emergency request for a stay of the two-week unsupervised visit ordered by the trial court, *Morgan v. Foretich*, 546 A.2d 407, 410–11 (D.C.1988) (*Morgan III*). Our court, sitting en banc, refused to stay the

order, and the Supreme Court of the United States denied a stay, *Morgan v. Foretich*, 483 U.S. 1053, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).

## II.

This is not the first time that Dr. Morgan has raised the specter of a constitutional violation to seek her release in spite of her defiance of court orders. In attacking her initial contempt commitment she urged that she had been denied a due process right to a public hearing. This court rejected her argument and held in effect that the best interests and the privacy rights of the child outweighed Dr. Morgan's right to a public hearing in a civil contempt proceeding in the Family Division. *See Morgan v. Foretich*, 521 A.2d 248, 253 (D.C.1987) (*Morgan I*); *Morgan II, supra* note 1, 528 A.2d at 426–27. If the best interests of the child may be balanced against Dr. Morgan's claimed right to an open hearing before being committed, it stands to reason that the child's best interests may be weighed against Dr. Morgan's claimed right to be released on the ground that she can never be coerced to produce the child she has hidden. *Cf. Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976) (noting that due process "is not a technical conception with a fixed content unrelated to time, place and circumstances" (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961)), and holding that, in determining what process is due, the government's interest must be weighed against private liberty or property interests and the risk of erroneous decisions); *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (balancing, in a procedure to terminate the petitioner's parental rights, the state's interest in the welfare of the child against the parent's interests in maintaining the care and custody of her children). Significantly, the first sentence of our opinion in *Morgan III* reads, "The formal parties to this appeal are the divorced parents of a daughter, H, the ultimate real party in interest." 546 A.2d at 408.

Judge Ferren attempts to use the civil contempt cases, involving recalcitrant immunized witnesses who have refused to testify in criminal trials or before grand juries in the government's fight against organized crime, to support his conclusion not only that Dr. Morgan must be released, but that the welfare of the child in this custody dispute—the very interest underlying the commitment—cannot be considered in assessing Dr. Morgan's right to release. I suggest that, to the contrary, these cases require affirmance of the trial court's order.

By way of background, I briefly allude to case development that renders questionable Dr. Morgan's reliance on her continued recalcitrance to secure her release. Embedded in Anglo–American law is the inherent power of the judiciary to coerce obedience to its orders by summarily holding a recalcitrant person—such as an immunized witness who refuses to testify at a grand jury proceeding or at trial—in civil contempt and thus imprisoning him until he complies. *In re Grand Jury Investigation (Braun)*, 600 F.2d 420, 422 (3d Cir.1979).

The Supreme Court has characterized such conditional commitment orders, although they grow out of criminal proceedings, as civil in nature, and therefore valid orders of imprisonment for which indictment and jury trial are not constitutionally required. *Shillitani v. United States*, 384 U.S. 364, 368–71, 86 S.Ct. 1531, 1534–36, 16 L.Ed.2d 622 (1966). The rationale for coercive imprisonment without the safeguards constitutionally afforded criminal defendants is that contemnors hold "the keys of their prison in their own pockets." *Id.* at 368, 86 S.Ct. at 1534 (quoting *In re Nevitt*, 117 F. 448, 461 (8th Cir.1902)); *King v. Department of Social and Health Services*, 110 Wash.2d 793, 800, 756 P.2d 1303, 1308 (1988) (en banc).[2] Of course, since it is impossible to succeed in coercing what is beyond a person's power to perform, the

rationale for conditional imprisonment vanishes when the contemnor no longer has the *ability* to comply with the court's order and thus use the key. *See Shillitani, supra*, 384 U.S. at 371, 86 S.Ct. at 1536 (citing *Maggio v. Zeitz*, 333 U.S. 56, 76, 68 S.Ct. 401, 411, 92 L.Ed. 476 (1948)); *In re Grand Jury Investigation, supra*, 600 F.2d at 423. In recent years, courts faced with situations involving indeterminate periods of confinement for civil contempt have reasoned that once that confinement has lost its coercive force, it becomes punitive and requires release. *See, e.g., Lambert v. Montana*, 545 F.2d 87 (9th Cir.1976). To foreclose such indeterminate confinements and to draw the line between what is coercive and what is punishment, a federal statute exists. *See* 28 U.S.C. § 1826 (1989 Supp.); *In re Grand Jury Investigation, supra*, 600 F.2d at 425.

The majority can draw no comfort from reliance on these "immunized witness" cases. In *Morgan II, supra* note 1, 528 A.2d at 428, we held that "justification is established only upon a showing of inability to perform or substantial performance," and only last year, we reiterated this principle in *D.D. v. M.T., supra* note 1, 550 A.2d at 44 (citing *Maggio v. Zeitz, supra*, 333 U.S. at 76, 68 S.Ct. at 411; *Smith v. Smith*, 427 A.2d 928, 932 (D.C.1980)). Moreover, the criminal witness cases cannot be used to support Judge Ferren's insistence that *only* factors bearing on the status of the contemnor (*i.e.*, age, health, length of incarceration, reasons given by the contemnor for refusing to obey, etc.), to the exclusion of the very reasons for the confinement, can be relevant to the continued confinement of Dr. Morgan. The relevancy of the welfare of a third party in these cases has not surfaced because, factually, there has been no third party.

In fact, the controlling case—the only civil contempt case bearing a factual resemblance to the instant case—the only

---

**2.** Even in the context of criminal contempt, where due process concerns are more central, a summary proceeding is all that is required prior to commitment for a contempt, like that here, committed in the court's presence. Super.Ct. Crim.R. 42; *In re Hunt*, 367 A.2d 155, 156 (D.C.),

*cert. denied*, 434 U.S. 817, 98 S.Ct. 54, 54 L.Ed.2d 72 (1977). Notably, nonappearance counts as a contempt committed in the court's presence, *id.;* by similar logic, withholding a child from the court's protection is a contempt committed in the presence of the court.

case involving the refusal of a contemnor to produce a child—is *King, supra.* Judge Ferren dismisses this case in a footnote, with the conclusory comment, "We must disagree." In that case, the Supreme Court of the State of Washington reversed the decision of a lower appellate court terminating the confinement of a father who had refused to reveal the whereabouts of an allegedly abused son, and ordered recommitment. The court, relying on the Second Circuit's decision in *Simkin v. United States,* 715 F.2d 34 (2d Cir.1983) (an immunized witness case), held that given the express legislative concern for the physical and emotional well-being of children, the trial court's power to coerce compliance was crucial.[3] *King, supra,* 110 Wash.2d at 800, 756 P.2d at 1308. Because the mere passage of time does not transform coercive contempt into punitive contempt, *id.,* 110 Wash.2d at 802, 756 P.2d at 1309, the trial court could use its broad civil contempt powers to coerce compliance with its order to bring to the court a child who was allegedly the victim of abuse, and could therefore incarcerate the responsible adult until he or she complied with the order. *Id.,* 110 Wash.2d at 800, 756 P.2d at 1308.

The approach of *King,* says Judge Ferren, cannot be countenanced because this imprisonment is for all practical purposes "punitive." Judge Ferren's conclusion is wrong. It is right only insofar as it tells us that for due process reasons Dr. Morgan's continued confinement must bear a reasonable relationship to the purpose for which she was committed. *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972); *In re Grand Jury Investigation, supra,* 600 F.2d at 424; *Lambert v. United States,* 545 F.2d 87, 89 (9th Cir.1976). It is wrong, however, when it tells us that there is no such reasonable relationship. Dr. Morgan's continued confinement bears more than a reasonable relationship to the safety of a child whom she has caused to be removed from the jurisdiction of a protecting court. In the circumstances of this case, the custody action cannot be separated from the contempt.[4] "[A] civil contempt proceeding is part of the original cause." *D.D. v. M.T., supra* note 1, 550 A.2d at 44. Even if Dr. Morgan therefore had a right to rely upon a due process claim, here, powerful countervailing interests in the safety of the child would defeat that claim in the absence of statutory compulsion.

The trial court found that Dr. Morgan had not proved that Dr. Foretich sexually abused the child. This was the holding that this court affirmed in *Morgan II, supra* note 1, 528 A.2d at 428, and *Morgan III, supra,* 546 A.2d at 409, and with respect to which the Supreme Court of the United States has denied *certiorari, Morgan v. Foretich,* —— U.S. ——, 109 S.Ct. 790, 102 L.Ed.2d 781 (1989). The majority's release of Dr. Morgan at this stage of the proceedings, therefore, presents a frightening prospect for child custody disputes. Those who have taken sides in this controversy would do well to consider that a child abuser could as easily avail himself or herself of the majority's holding as an accuser could. *Cf. In re Maurice M.,* 314 Md. 391, 550 A.2d 1135 (1988) (mother suspected of child abuse held in contempt for

---

3. The *King* court also recognized the importance of considering the best interests of the child in the decision, as this was the very purpose for which the father had been incarcerated:

> In deciding whether a contemnor's incarceration should continue, the trial court should also consider the significance of the ends to be achieved. It is appropriate for the court to balance its interests in enforcing compliance with a particular order and a contemnor's liberty. At some point, extended incarceration due to noncompliance with a relatively minor court order may be an abuse of discretion. In this case, the physical safety

and well-being of a minor child may be endangered by Mr. King's continued defiance of the court order. It is an example of the kind of factors the court should weigh in deciding whether to continue or terminate incarceration for civil contempt.

*King, supra,* 110 Wash.2d at 805, 756 P.2d at 1310.

4. The United States District Court for the District of Columbia has declined to entertain a petition for a writ of habeas corpus because of the pendency of the custody suit in the District of Columbia courts.

refusing, on self-incrimination grounds, to produce child), *cert. granted in part sub nom. Baltimore City Department of Social Services v. Bouknight,* — U.S. —, 109 S.Ct. 1636, 104 L.Ed.2d 152 (1989); *see also King, supra* (father suspected of abuse held in contempt for refusing to produce child).

This is why the power to compel compliance, and the balancing of competing interests, is so crucial to custody proceedings. A missing child in these proceedings divests a protecting court of the power to act. In the tumult of charges and controversy in this case, we have no way of knowing in what way or by whom the child may have been psychologically (or otherwise) abused. We only know that the trial court rejected Dr. Morgan's allegations. While the civil contempt aspect of the case may have evolved from a contest between two parties, it is also a third party, a child, who is aggrieved. This was the import of Judge Steadman's wise citation of a Kikuyu proverb in our prior decision: "When elephants fight it is the grass that suffers." *Morgan III, supra,* 546 A.2d at 413.

### III.

The majority is right to the extent that there is some authority in the "immunized witness" contempt cases, that release should follow a finding that the contemnor cannot be coerced; it is wrong—unquestionably wrong—in concluding that we can disturb the finding of the trial court in this case that there is a "realistic possibility" or "substantial likelihood" that continued confinement will accomplish its coercive purpose. *See Simkin, supra,* 715 F.2d at 37.

The majority's reasoning is nothing more than a thinly disguised attempt to hold that this appellate court can find as a matter of law that Dr. Morgan cannot be coerced into obeying the trial court's order. Basic legal principles, and of course common sense, tell us that this cannot be the case. Any question as to the conduct of a human being is a factual one—a determination to be made by a factfinder on a case-by-case basis.[5] In the civil contempt context, the determination as to whether continued confinement will compel obedience requires a prediction as to what a particular human being will do in the future—obviously a matter for the factfinder.[6] Since a prediction, to the extent that a prediction about human behavior can be valid, is still a prediction, it is a factfinder who is in the best position to determine if there is a realistic possibility that continued confinement will coerce. A factfinder is in the best position to determine credibility. A factfinder is in the best position to determine whether a contemnor has the ability to comply with the court's order, a fact that need not concern us here in view of Dr. Morgan's recalcitrance—an admission that she can comply but will not. Moreover, this court cannot credit, as a matter of law, the protestation of a contemnor that he or she will never relent, nor can we determine it as a matter of fact, since this would defeat the very purpose of the justification for coercive imprisonment. Judge Dixon, after a hearing, made findings of fact. The majority's

---

**5.** Importantly, the Supreme Court's holding about constitutional fact review in *Bose Corp. v. Consumer Union of the United States,* 466 U.S. 485, 511, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984), relied upon in Judge Ferren's opinion, is limited to the First Amendment context. Moreover, unless it would involve abdicating our duty to state an actual constitutional norm or rule, independent appellate review of the facts is generally *not* warranted even in constitutional contexts. *See* Monaghan, *Constitutional Fact Review,* 85 Colum.L.Rev. 229, 264, 266 (1985). Many facts are determinative of a case, but few must be reviewed independently to determine the *content* of the *law* to be applied to them. Moreover, where the only fact on review is a predictive judgment about the contemnor's future behavior, it may be detrimental to important constitutional concerns to rely upon anything *less* than the trial court's judgment, based upon direct exposure to the contemnor.

**6.** For example, it is the factfinder who is called upon to determine whether a person accused of crime will be dangerous if released before trial, *United States v. Edwards,* 430 A.2d 1321 (D.C. 1981) (en banc), *cert. denied, Edwards v. United States,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141 (1982), and whether a mentally ill person will, if released, constitute a danger to himself or others. *Jones v. United States,* 432 A.2d 364 (D.C.1981) (en banc), *aff'd,* 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983).

conclusions about the facts of this case are not the words of a factfinder.

It is for these reasons that appellate courts, without exception, have held that it is the trial court that has the discretion to make the determination as to whether continued confinement will accomplish its purpose and that the trial court's decision is "virtually unreviewable." Thus, the Second Circuit noted in *Simkin, supra*, 715 F.2d at 38:

> A district judge's determination whether a civil contempt sanction has lost any realistic possibility of having a coercive effect is inevitably far more speculative than his resolution of traditional factual issues. Since a prediction is involved and since that prediction concerns such uncertain matters as the likely effect of continued confinement upon a particular individual, we think *a district judge has virtually unreviewable discretion both as to the procedure he will use to reach his conclusion, and as to the merits of his conclusion.* [Citing *Soobzokov v. CBS, Inc.*, 642 F.2d 28, 31 (2d Cir.1981); *In re Grand Jury Investigation, supra.*] ... We have located no decision of a court of appeals requiring a district court to take testimony from a contemnor on the issue of the utility of continued confinement or rejecting a district court's conclusion that such confinement is warranted.
>
> \*     \*     \*     \*     \*     \*
>
> There must be an individualized decision.

(Footnotes omitted; emphasis supplied.) *See also Sanchez v. United States*, 725 F.2d 29, 31 (2d Cir.1984) (explaining *Simkin* from burden of proof standpoint, and noting "the District Judge must determine, as best he can, whether the contemnor has persuaded him that continued confinement holds no realistic possibility of producing a willingness to testify."). *See In re Parrish*, 782 F.2d 325, 328 (2d Cir.1986) ("[I]t is whether *the district judge* believes, based on all the circumstances pertinent to that

contemnor, that no such realistic possibility exists." (emphasis in original)); *In re Dickinson*, 763 F.2d 84, 89 (2nd Cir.1985) (citing *Simkin*, "a district judge has virtually unreviewable discretion both as to the procedure he will use to reach his conclusion, and as to the merits of his conclusion"); *Soobzokov v. CBS, Inc., supra*, 642 F.2d at 31.

The majority, disregarding the degree of deference it is required to accord the trial court's finding, follows a most distressing approach.[7] It rejects an abuse of discretion standard of appellate review, and although it pronounces a clearly erroneous standard, it nonetheless proceeds to substitute its judgment for that of the trier-of-fact. The majority's abstract discussion of the reasons why Judge Dixon's findings of fact are clearly erroneous speaks for itself in unpersuasive detail. Yet it becomes a vehicle for ordering Dr. Morgan's release. Judge Ferren and Judge Belson have not heard Dr. Morgan testify.

Credibility is of critical significance in this case. Dr. Morgan has justifiably or unjustifiably wrapped herself in the mantle of motherhood. It would be well for all of us, litigants and judges alike, to recall the wisdom of King Solomon as reported in 1 *Kings* 3:16–28. There Solomon hears a dispute between two women, each of whom has borne a child. One child has lived, the other has died. Each woman claims the living child as her own. When Solomon sends for a sword and proposes to divide the living child between them, one woman accedes and the other opts to relinquish the child, prompting Solomon to decide the identity of the real mother. Lest this account be taken as support for Dr. Morgan's position, I hasten to say that it is Dr. Morgan who has, from the beginning, fought to unseal the record before us to publicly air lurid details of evidence she has submitted which are relevant to, but not determinative of, her right to curtail visitation, and which might run the risk of irrevocably harming her daughter. She has

---

7. The District of Columbia has suggested another approach—the establishment of a time period limiting the duration of conditional confinement for civil contempt—a time period when

due process considerations may be presumed to attach. This is of course a matter for the legislature.

made her daughter a fugitive from the law. A reasonable factfinder could draw the inference that she is willing to risk harm to her daughter to vindicate in a public forum her claim that the man with whom she once shared a mutual obsession has abused his daughter and that the judicial system (which she has exhaustively used) has failed to protect the daughter. Even today, in this proceeding, while proclaiming that she will never produce the child, she is demanding the protection of this court for herself and strenuously arguing that the best interests of the child are not at issue.[8]

I do not know what Judge Ferren means by suggesting that vindication of the trial court's authority should not be our concern.[9] I join the majority in commending Judge Dixon's diligence and fortitude. I would only add that one cannot read the transcripts and rulings in this case without concluding that the trial court has fulfilled, in the finest tradition, the judicial oath "that I will administer justice—without respect to persons."

I would leave with the trial judge—where it belongs—the discretion to determine facts underlying this contemnor's demand for release. I would hold that at this point in time, there has been no showing of abuse of discretion.[10]

---

**8.** In *Morgan III, supra,* 546 A.2d at 414, we stated:

Probably neither our courts nor any courts anywhere in the world can deal in a perfect way with matters so intimately linked to a family unit formed and dissolved. We can but try. The little girl H grows older day by day. It is she, first and foremost, to whom the courts must seek to render justice as the process moves on.

**9.** In *D.D. v. M.T., supra* note 1, 550 A.2d at 44, we stated:

Courts have a right to demand, and do insist upon, full and unstinting compliance with their commands. One who is subject to a court order has the obligation to obey it honestly and fairly, and to take all necessary steps to render it effective. *Village of Great Neck Estates v. Rose,* 279 A.D. 671, 108 N.Y. S.2d 95, 97 (2d Dept.1952), *appeal dismissed,* 303 N.Y. 904, 105 N.E.2d 491 (1951). He or she may not do the prohibited thing, nor permit it to be done by his or her connivance. *Roehl v. Public Utility Dist. No. 1 of Chelan County,* 43 Wash.2d 214, 231, 261 P.2d 92, 101 (1953) (en banc). Indeed, he or she must be

Before ROGERS, Chief Judge, MACK, NEWMAN, FERREN, BELSON, TERRY, STEADMAN, SCHWELB,* and FARRELL,† Associate Judges.

## ORDER

PER CURIAM.

It appearing that a majority of the judges of this court has voted, *sua sponte,* to rehear this case en banc, it is

ORDERED that the opinions and judgment filed this date are hereby vacated. It is

FURTHER ORDERED that the Clerk shall schedule this matter for consideration before the court sitting en banc as soon as the calendar permits. Counsel are hereby directed to provide ten copies of the briefs heretofore filed with the Clerk within 10 days from the date of this order.

Before ROGERS, Chief Judge, and MACK, NEWMAN, FERREN, BELSON, TERRY and STEADMAN, Associate Judges.

## JUDGMENT

On consideration of the emergency motion of Dr. Morgan for immediate release

---

diligent and energetic in carrying out the orders of the court, *Swift v. Blum,* 502 F.Supp. 1140, 1143 (S.D.N.Y.1980), and a token effort to comply will not do. *Sound Storm Enterprises, Inc. v. Keefe,* 209 N.W.2d 560, 568 (Iowa 1973).

**10.** Judge Belson mischaracterizes my view in suggesting that I have concluded "that the trial judge can make a purely discretionary decision as to whether a contemnor should be released." Although the civil contempt cases, relied upon and yet distinguished by Judge Ferren, speak of trial decisions as being "virtually unreviewable," I am only suggesting that the trial court has the right to determine the underlying fact of "coercibility" *if* that is the trigger of release. (I note that our cases have spoken in terms of "inability to perform or substantial performance." *Morgan II,* 528 A.2d at 428; *D.D. v. M.T., supra* note 1, 550 A.2d at 44.) I would only reverse for abuse of discretion.

* Associate Judge Schwelb did not participate in the petition for rehearing en banc.

† Associate Judge Farrell has recused himself from this case.

from incarceration pursuant to the District of Columbia Civil Contempt Imprisonment Limitation Act of 1989 (the Act), Pub.L. No. 101– (September 23, 1989), and the opposition thereto by Dr. Foretich contesting the constitutionality of the Act, and it appearing that Dr. Morgan is incarcerated by virtue of an order of the Superior Court of the District of Columbia issued in a proceeding for custody of a minor child conducted in the Family Division of the Superior Court, and that the enactment of the Act requires reconsideration of that order, this appeal having been taken from an order of the Superior Court denying the motion of Dr. Morgan for relief from an order of civil contempt and from an order of that court refusing to issue a writ of habeas corpus, it is

ORDERED and ADJUDGED that the case is remanded to the Superior Court for entry of an order forthwith releasing Dr. Morgan from custody pursuant to the Act, such release being without prejudice to any proceedings which the trial court may conduct, following release, with respect to the constitutionality of the Act.