**In the Matter of Milton PARRISH.**

**UNITED STATES of America, Appellant,**

v.

**Milton PARRISH, Appellee.**

**No. 574, Docket 85–1321.**

United States Court of Appeals, Second Circuit.

Argued Dec. 10, 1985.

Decided Jan. 21, 1986.

Warren Neil Eggleston, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., New York City, on the brief), for appellant.

Noah A. Kinigstein, New York City, for appellee.

(Linda Backiel and Margaret Ratner, New York, N.Y., submitted a brief on be-

half of the Center for Constitutional Rights as amicus curiae.)

Before VAN GRAAFEILAND, NEWMAN, and MINER, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

■ This is an appeal by the United States from an order of the District Court for the Southern District of New York (Whitman Knapp, Judge) discharging Milton Parrish, a recalcitrant grand jury witness, from confinement for civil contempt. Judge Knapp concluded that, after incarceration for seven months, there was no " 'realistic possibility that continued confinement might cause [Parrish] to testify.' " *In re Parish* 613 F.Supp. 356 (S.D.N.Y.1985) (quoting *Simkin v. United States,* 715 F.2d 34, 37 (2d Cir.1983)). On appeal the Government makes a general challenge to *Simkin* and related decisions and specifically contends that this case should be remanded with directions that the District Court reconsider the issue of Parrish's release in light of what the Government claims is a "strong presumption that any period of incarceration up to 18 months is coercive, not punitive." Brief for Appellant at 9. We conclude that no such presumption exists and that Judge Knapp correctly applied the pertinent standard. We therefore affirm.

The Government's contact with Parrish began on October 18, 1984, at 12:10 a.m. when agents of the Joint Terrorist Task Force executed a search warrant at his apartment in New York City. Parrish was awakened, handcuffed, and told that he was under arrest. The agents were investigating a criminal enterprise allegedly involving armed robberies and prison escapes. One of the participants was alleged to be Coltrane Chimurenga. During a four-hour search of Parrish's apartment, agents seized false and illegal identification of Chimurenga, a police radio scanner, books on police radio frequencies, and, from the top of the stove, a pot containing burnt documents. At the conclusion of the search Parrish was taken, in handcuffs, to the New York City office of the Federal Bureau of Investigation. There Parrish overheard agents discussing his arrest as a "fishing expedition" and speculating that he would probably sue. At that point (it was then 4:50 a.m.) Parrish was handed a grand jury subpoena, the handcuffs were removed, and he was told he could leave. In the Government's view, Parrish "was not formally arrested." Brief for Appellant at 3.

A hearing on a motion to quash the subpoena was held December 20, 1984. The motion was denied, and Parrish was ordered to appear before the grand jury that afternoon. He appeared but refused to answer questions, despite the issuance of a use immunity order. *See* 18 U.S.C. § 6002 (1982). The same day Parrish was cited for civil contempt pursuant to 28 U.S.C. § 1826(a) (1982) and ordered confined until he answered the grand jury's questions, until the grand jury's term expired, or until June 20, 1986, the end of the statutory maximum period of eighteen months, whichever occurred first.

Chimurenga and others were indicted and tried on a variety of charges. Parrish was named as an unindicted co-conspirator. On July 15, 1985, he testified as a defense witness at trial and was cross-examined by the Government. The trial concluded on August 5 with convictions on counts charging weapons and false statement violations and acquittals on counts charging RICO, Hobbs Act, and prison escape violations.

Previously, on June 21, 1985, Parrish had moved for release from confinement for contempt, alleging in an affidavit that no length of incarceration would coerce him into testifying before the grand jury. The District Court held a hearing on the motion on July 19 and July 23. Parrish testified to his adamant refusal ever to answer questions before the grand jury. He claimed that doing so would be a betrayal of the "Black Liberation Movement" and that he was "opposed to the grand jury." He

presented one witness who reported that Parrish had said he would never testify before the grand jury. The Government presented no evidence. On July 24, Judge Knapp granted the motion, stating that he was persuaded that there was no realistic possibility that continued confinement might persuade Parrish to testify. Judge Knapp supplemented his ruling the following day with a memorandum emphasizing that he had not exercised discretion in the matter but had only determined the issue posed for him by this Court's decision in *Simkin v. United States, supra. See also Sanchez v. United States*, 725 F.2d 29 (2d Cir.1984). The trial judge also expressed his displeasure with *Simkin* and characterized the result of his ruling as "unwarranted."

### Discussion

It is not entirely clear whether the Government, in pressing this appeal, is critical of the District Court's ruling, of the *Simkin* decision which that ruling faithfully applied, or simply of the fact that Parrish has not been required to serve the eighteen months that Congress has authorized as the maximum confinement for a recalcitrant grand jury witness. *See* 28 U.S.C. § 1826(a). Whatever the Government's rationale, the order releasing Parrish is not in any respect erroneous.

In *Soobzokov v. CBS*, 642 F.2d 28, 31 (2d Cir.1981), we said, "When it becomes obvious that [civil contempt] sanctions are not going to compel compliance, they lose their remedial characteristics and take on more of the nature of punishment." In several cases dealing with recalcitrant grand jury witnesses, we have recognized the difficulty faced by district judges in determining when it may fairly be said that confinement

has ceased to serve the purposes of civil contempt and has become punishment, which may be achieved, where warranted, by criminal contempt. *See In re Dickinson*, 763 F.2d 84 (2d Cir.1985); *Sanchez v. United States, supra; Simkin v. United States, supra.* The determination to be made by the district judge is far removed from traditional factfinding. What is called for is obviously not a retrospective determination of a historical fact, nor even a prospective determination of a future fact, such as the amount of medical expenses a tort victim will incur. The determination is not even akin to fact-finding as to a future hypothetical matter, such as the profits a plaintiff would have made but for a defendant's actionable wrongdoing. Instead, the district judge is obliged to look into the future and gauge, not what will happen, but the *prospect* that something will happen. In recognition of the speculative nature of this determination, *Simkin* was at pains to specify that a contemnor need be released only upon a determination that there no longer remains "a realistic possibility that continued confinement might cause the contemnor to testify," 715 F.2d at 37, with the burden of proof "on the contemnor to demonstrate that no such realistic possibility exists." *Id.*

 It should be obvious that the contemnor's assertion that he will never testify need not be accepted at face value. Even if the district judge concludes that a contemnor is being truthful when he testifies that he will never testify, release is not required.[1] The contemnor may conscientiously believe at the time he testifies that incarceration will not coerce him into compliance, but the issue is not whether *the contemnor* believes there is no realistic

---

1. From unreported opinions of Southern District judges called to our attention by the Government, it appears that in other cases a standard more lenient than that outlined in *Simkin* may have been applied. For example, one district judge has read *Simkin* to mean that confinement "will never be justified if *the witness expresses truthfully* a willingness to be con-

fined until the expiration of the grand jury," and has released a contemnor upon a finding that "her present state of mind is such that she is *unlikely* to comply during the balance of the permissible period of confinement." *In re Clay*, No. M–11–188 (S.D.N.Y. June 27, 1985) (emphasis added).

possibility that continued confinement might cause him to testify; rather, it is whether *the district judge* believes, based on all the circumstances pertinent to that contemnor, that no such realistic possibility exists. Prior to confinement, many recalcitrant witnesses have said and may have conscientiously believed that they would never testify. Incarceration has caused some to change their minds. Even during confinement, a contemnor's prediction that he will never testify may be honestly made, yet altered by continued confinement. But if the judge is persuaded, as Judge Knapp was here, that after several months in custody not even a realistic possibility remains that continued confinement might cause the contemnor to testify, then his release is warranted because further confinement in such circumstances would be punitive.

The Government contends that Parrish's release is somehow contrary to Congressional intent as expressed in section 1826. The Government seems to be contending that the eighteen-month period set by Congress as the maximum confinement for a recalcitrant grand jury witness is in reality also a minimum, unless the term of the grand jury earlier expires. Yet the Government does not dispute that a district judge retains broad discretion to determine in the first instance the maximum length of time for confinement, within the outer limit of eighteen months. Since Judge Knapp had discretion on December 20, 1984, to confine Parrish for no more than seven months, thereby making a prospective determination that a longer confinement would not serve the purposes of civil contempt, it is difficult to see why he may not determine on July 24, 1985, after seven months' confinement has produced no testimony, that further confinement holds no realistic possibility of having a coercive effect. The Government reads section 1826 as if it provided that a contemnor *shall* be confined for eighteen months unless the witness testifies or the term of the grand jury ends. The statute does not so provide. Instead it provides that a district judge "may" summarily confine a recalcitrant witness until either he testifies or the term of the grand jury ends, and then adds that "in no event shall such confinement exceed eighteen months."

Moreover, the legislative history of section 1826 makes clear that Congress did not believe it was adding rigidity to judges' traditional powers of civil contempt by mandating prolonged confinement; on the contrary, key legislators in both chambers acknowledged that Congress was endeavoring "to codify the present law on civil contempt." 116 Cong.Rec. 35,291 (1970) (remarks of Cong. Poff); *see also Hearings on S. 30 before Subcomm. No. 5 of the House Comm. on the Judiciary,* 91st Cong., 2d Sess. 99 (1970) (remarks of Sen. McClellan). Interestingly, when the Department of Justice successfully opposed legislative proposals to reduce the maximum confinement period under section 1826 to six months, it assured Congress that under the existing statute, "A court is free to conclude at any time that further incarceration of a recalcitrant witness will not cause the witness to relent and testify, and, upon such grounds, to release the witness from confinement." *Grand Jury Reform: Hearings on H.R. 94 Before the Subcomm. on Immigration, Citizenship, and International Law of the House Comm. on the Judiciary,* 95th Cong., 1st Sess. 713 n. 1 (1977) (statement of Asst. Atty. Gen. Civiletti).

The order of the District Court is affirmed.