**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**PRINCETON ECONOMIC INTERNATIONAL LTD., Princeton Global Management Ltd. & Martin A. Armstrong, Defendants.**

**Commodity Futures Trading Commission, Plaintiff,**

v.

**Princeton Economic International Ltd., Princeton Global Management Ltd. & Martin A. Armstrong, Defendants.**

No. 99 CIV. 9667(RO), 99 CIV. 9669(RO).

United States District Court, S.D. New York.

July 17, 2001.

458

Dorothy Heyl, United States Securities & Exchange Commission, New York City, for Securities and Exchange Com'n.

Vincent A. McGonagle, United States Commodity Futures Trading , Washington, DC, for Commodity Futures Trading Com'n.

Tancred V. Schiavoni, Stamatios Stamoulis, O'Melveny & Myers LLP, New York City, for Temporary Receiver Alan M. Cohen.

Bernard V. Kleinman, White Plains, NY, for defendant Martin A. Armstrong.

## OPINION & ORDER

OWEN, District Judge.

This Opinion and Order serves to supplement my prior oral findings and order of July 6, 2001 that the previously-imposed confinement of Martin A. Armstrong in the Metropolitan Correctional Center on an order of civil contempt still serves coercive purposes; it might yet yield its intended result and should therefore be continued in order to coerce compliance with this Court's Contempt Order of August 25, 2000. The estimated value of the missing corporate assets, as documented by the Temporary Receiver,[1] is approximately $14.9 million and Armstrong has come forward with not a scintilla of evidence to suggest good faith efforts to comply with the Contempt Order, or that he is either unable to comply or that the contempt has lost all of its coercive effect.

██ I reached this conclusion at the hearing on July 6, 2001 and, upon receipt of opposition papers from Armstrong's CJA counsel, I reexamined the issue and remain of the opinion, based on my "individualized assessment" of Armstrong and the circumstances of the contempt, see In re Grand Jury Subpoena (John Doe), 150 F.3d 170, 172 (2d Cir.1998), that there is a "realistic possibility" that extending the term of Armstrong's confinement will eventually compel compliance with the Contempt Order. See Simkin v. United States, 715 F.2d 34, 37 (2d Cir.1983); United States v. Salerno, 632 F.Supp. 529, 531 (S.D.N.Y.1986) (citing In the Matter of Milton Parrish, 782 F.2d 325 (2d Cir. 1986)). The authority for such continuation is derived from the District Court's general and inherent equitable powers to coerce compliance with its lawful orders.[2] See Chambers v. NASCO, Inc., 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27

---

1. Judge Kaplan of this Court, sitting in Part I, appointed Alan M. Cohen, Esq. as Temporary Receiver on September 13, 1999.

2. Relying on 28 U.S.C. § 1826, both Armstrong's pro se submissions and those of his CJA counsel, suggest that 18 months is the outer limit on Armstrong's period of civil confinement. The "Recalcitrant Witness" statute is inapplicable to this matter because § 1826 "[s]ets a maximum limit of 18 months incarceration for witnesses found in civil contempt of court," usually pertains to grand jury proceedings, and does not because of the ipse dixit of counsel apply to one under court order to produce missing corporate assets, especially since § 1826 is not cited anywhere in the Contempt Order. See Sigety, 632 F.2d at 976 (emphasis added); see also Dole Fresh Fruit Co. v. United Banana Co., Inc., 821 F.2d 106, 110 (2d Cir.1987) (noting distinction between § 1826 and general contempt power to coerce compliance with court ordered equitable relief); United States ex rel Thom v. Jenkins, 760 F.2d 736, 737–740 (7th Cir.1985) (upholding continued confinement for civil contempt "until such further order of the

(1991); *Shillitani v. United States*, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); *Sigety v. Abrams*, 632 F.2d 969, 976 (2d Cir.1980).

■ The burden is on Armstrong to prove impossibility of compliance or that confinement has become punitive and not coercive. *See In re Marc Rich & Co., A.G.*, 736 F.2d 864, 866 (2d Cir.1984); *Simkin*, 715 F.2d at 36–37. Armstrong has not produced the missing black Compaq computer (Contempt Order, ¶ I(1)), the missing gray Dell computer hard drive (Contempt Order, ¶ I(2)) or any additional corporate assets since January 14, 2000, all of which are specifically identified in the Contempt Order of August 25, 2000.[3] Further, Armstrong has communicated no information whatsoever about the present disposition of those items to the Temporary Receiver, despite no fewer than fourteen letters from April 2000 through June 2001 from the Temporary Receiver to Armstrong personally and his attorneys; all of this correspondence, the latest of which, representative thereof, is attached hereto as Appendix A, offers the Receiver's assistance in retrieving items identi-

fied in the Contempt Order and purging Armstrong's contempt. Nevertheless, Armstrong has not come forward with any evidence regarding the whereabouts, much less produced, the 102 gold bars (Contempt Order, ¶ IV(2)), the 699 gold bullion coins (Contempt Order, ¶ IV(1)), the ancient coins purchased pre-September 1998 (Contempt Order, ¶ IV(4)) and the $750,000 bust of Julius Caesar (Contempt Order, ¶ IV(3)), all detailed, again, in this Court's Contempt Order at pages 9–18 and, once more, in the declaration of Tancred V. Schiavoni, Esq., Special Counsel to the Temporary Receiver, executed on July 6, 2001, at ¶¶ 2–3, 6–12.

■ The burden of producing such evidence is on Armstrong. "It is well-settled that if a court finds that a defendant could at some time in the past have complied with a court order, the court should presume a present ability to comply ...." *See Thom*, 760 F.2d at 739–740 (quoting *United States v. Rylander*, 460 U.S. 752, 757, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983)). The record is clear that Armstrong remains in possession, custody and control of the corporate assets identified in the Con-

court" for failure to pay judgment where district judge had concluded that contemnor failed to produce evidence that he had become unable to pay); *Natural Gas Pipeline Co. of America v. Fritz*, 853 F.Supp. 236, 237 (S.D.Tex.1994) (reading eighteen month period of confinement in § 1826 as applicable only to grand jury proceedings); *Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of Virginia, L.L.C.*, 2001 WL 637387, at *1–3 (S.D.N.Y. June 8, 2001) (continuing indeterminate period of civil confinement to coerce compliance with preliminary injunction pursuant to general contempt power). I reiterate, as I did on page 26 of my findings of fact and conclusions of law dated August 25, 2000 (the written Contempt Order), that Armstrong's contempt is not based on § 1826, but on the inherent authority of all courts to coerce compliance with lawful orders. Although I did reference eighteen months at the hearing, this was unintentional and, if anything, has *de facto* provided Arm-

strong with an opportunity to be heard regarding his contempt. Had I not erroneously uttered the words "eighteen months," the hearing of July 6, 2001 would likely have occurred only on an application from Armstrong producing some prima facie evidence of good faith efforts to comply, impossibility of compliance, etc., and tending to suggest that a hearing was warranted. Thus, Armstrong has not been prejudiced by any confusion. I observe further that the Second Circuit seemed quite clear in its summary order dated March 27, 2001 (00–6076, 00–6156) dismissing Armstrong's appeal for lack of jurisdiction that the civil contempt order was premised on the Court's general power.

**3.** This Court entered "turn-over" orders dated September 13, 1999 (the TRO signed by Judge Kaplan sitting in Part I) and on January 7, 2000.

tempt Order and, most recently reidentified in the Stamoulis and Schiavoni Declarations. For example, Armstrong testified at the contempt hearing on January 14, 2000 that he took the gold bars from the office at Carnegie Center in 1998, brought them home and subsequently gave them to Akira Setogawa after Setogawa showed up in a limousine at Armstrong's home. However, the limousine driver, Michael Faulkner, whom Armstrong testified at the contempt hearing witnessed Setogawa take the missing gold bars, denied during a deposition that he ever saw Armstrong give any gold or gold bars to Setogawa. The Temporary Receiver also submitted a signed[4] transcript of the examination of Nigel Kirwan, in a proceeding to which the Receiver was not party, on which Armstrong relies to support his assertion that Kirwan is holding the assets in trust and Armstrong has no control over Kirwan. Armstrong's counsel argued:

> And if I could, your Honor, the only thing is to comment on the Kirwan deposition, which [is] one of the documents of the receiver relies upon—part of the deposition that the receiver cites is that part that talks about the assets being held in trust, that Kirwan's holding certain assets in trust, in Australia, and I don't see, even if Mr. Armstrong is released, he's not traveling to Australia to recover those assets and I don't think that Mr. Kirwan would follow any particular order of Mr. Armstrong to release those assets even if he had the power to ask him to do so.

(Tr. at 30.) Kirwan's answers in this deposition, however, are some of the strangest, most unbelievable, statements this Court has ever encountered. Kirwan claims to be the trustee of two trusts with the same name. (Kirwan Dep. at 89., attached as Ex.18 to Schiavoni Decl.) He testified that one trust has a bank account in Switzerland, (Kirwan Dep. at 91), but he does not know the name of the bank (*id.*) and does not have any documents in Australia that show the identity of the bank (*id.*) despite his position as trustee. If such statements were not enough to warrant dismissal of Kirwan's assertions in this examination, I observe that Kirwan *never* acknowledges *actually having the assets* anywhere in the transcript.

Put simply, there is no new evidence before me. Armstrong has provided me, but mostly the Court of Appeals, nothing but self-serving and conclusory statements that he does not have possession, custody or control over the assets sought by the Temporary Receiver, but has come forward with no hard evidence to substantiate this assertion. *See Rylander,* 460 U.S. at 757–758, 103 S.Ct. 1548 (holding defendant does not meet burden of production with an ex parte affidavit denying ability to comply). Thus, he has not satisfied his burden of production.

■ Armstrong's remaining assertion is that he cannot comply, and cannot be ordered to comply, with the Contempt Order because he is under indictment in a parallel criminal proceeding. Armstrong argues that, even assuming he had possession, custody or control of the missing corporate assets, compliance with the Contempt Order violates his Fifth Amendment privilege. This assertion must be disregarded on two grounds. First, Armstrong has undeniably waived his Fifth Amendment privilege. He did so on January 14, 2000 at the Contempt Hearing when he testified regarding the factual circumstances surrounding the gold bars, the coins, antiquities and bust of Julius Ceasar and, moreover, that he no longer had possession of these items—all testimony I did not credit. Regardless of my credibility

---

4. The transcript of the Kirwan deposition first appeared before me without a signature bearing authenticity. Subsequently, the Receiver filed a signed copy.

determination on these issues, had he wished to remain silent for fear of self-incrimination at that time, he could have done so by asserting the Fifth Amendment. His failure to do so operates as a waiver of the privilege.[5] Second, Armstrong's mountain of papers do not support any assertion of the Fifth Amendment. His current position, documented in an affidavit attached to his counsel's papers of July 11, 2001, is that he does not have possession, custody or control of the missing corporate assets. If this is the case, the Fifth Amendment cannot be asserted in good faith. In my effort to truly make an "individualized determination" about the Contemnor and the circumstances surrounding his contempt. I have reviewed the submissions and proceedings in the Second Circuit. Even the Court of Appeals expressed disbelief regarding his Fifth Amendment claim.[6] The following was the colloquy on the issue when the Circuit reviewed the Contempt Order:

The Court:[7] How does the Fifth Amendment issue arise—um, if, um, if Mr. Armstrong's position is that he doesn't have it? If he doesn't have any of these things, well, isn't it idle to talk about whether hypothetically it would be a violation of his Fifth Amendment rights to turn them over? To assert a Fifth Amendment right, wouldn't Mr. Armstrong have to say, "I have it" and "I won't give it to you because of my Fifth Amendment right?"

SEC: Well, arguably, he has testified that he has had the assets and that he had given them to somebody else, an argument that the District Court does not, um, believe.

The Court: I just find it strange. I mean, I find the assertion of the Fifth Amendment rather strange because usually one says I have something in my head or I have something in my possession that I will not turn over and that is why I'm asserting the Fifth Amendment because there is that possibility of incrimination. Here, his position is entirely different. His position is I don't have any of this stuff. I couldn't turn it over if I wanted to. So I'm not sure I know why the Fifth Amendment issue is really live here.

Against this background, I am not persuaded by Armstrong's assertion that his confinement for contempt may not continue based on a valid assertion of the Fifth Amendment.

Armstrong has produced no evidence.[8] What he has produced, however, is paper. Armstrong has, to date, filed no fewer than fifteen "emergency" motions in the Court of Appeals, including, it appears, two petitions for rehearing en banc, and, most recently, a petition for certiorari in

---

5. See generally Garner v. United States, 424 U.S. 648, 654, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976); Minnesota v. Murphy, 465 U.S. 420, 426, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984); United States v. Monia, 317 U.S. 424, 427, 63 S.Ct. 409, 87 L.Ed. 376 (1943); United States v. Matos, 990 F.Supp. 141, 144–145 (E.D.N.Y. 1998).

6. The Second Circuit's discussion of the Fifth Amendment issue at oral argument obviously was not integral to its decision to dismiss the appeal for lack of jurisdiction, but arose in

the context of a discussion of whether to construe Armstrong's appeal as a petition for a writ of mandamus.

7. Armstrong's appeal was before Chief Judge Walker, Judge Jacobs and Judge Calabresi. Judge Jacobs asked the questions excerpted here.

8. Armstrong's counsel acknowledged as much during argument before the Court of Appeals. Chief Judge Walker questioned Armstrong's counsel regarding proof that he gave assets to

the Supreme Court.[9] Although I will address the content of some of these papers which were put before me by Armstrong's CJA counsel, I do observe that this mountain of paper "[s]uggests the opposite of what, I suspect, was its intended effect." *Quantum Corp.*, 2001 WL 637387, at *2. "It demonstrates that [the contemnor] is beginning to feel the full coercive effects of his incarceration for civil contempt. Colloquially, he wants 'out.'" *Id.*

▉ Turning to the specifics of Armstrong's submissions, his counsel contends that there is no realistic possibility of compliance based on an recent affidavit submitted to the Court of Appeals seeking a writ of mandamus to prevent a previously scheduled, and later cancelled, deposition of Armstrong by the Temporary Receiver. Armstrong's affidavit states:

> Fifthly, and perhaps of the most importance, is the firm unshakable belief that I have that the proceedings in this Court are solely designed to curb and destroy my civil rights. And, their intent is solely to create pretrial incarceration to extort, through physical and psychological pressure, cruel and unusual punishment prior to any adjudication, in a vain to attempt to extort, by brute force, a guilty plea in the criminal case. I would

sooner waive my right to life than compromise my integrity. I shall not submit—ever—to the demands of this Court as I view them as un-American and perfect examples of how the terms "justice" and "liberty" have become hollow words.[10]

(Armstrong Dep. at 3, attached as Ex. D to Kleinman Decl. and Mem. of Law in Support of Contemnor's Objection to Continued Incarceration, dated July 11, 2001.) Armstrong's counsel contends that these words "[e]stablish the impossibility of Mr. Armstrong's compliance with this order to turn over." (Tr. at 28.) As a threshold matter, "The Court need not accept a contemnor's assertions of unwaivering recalcitrance at face value." *Salerno*, 632 F.Supp. at 531 (quoting *Parrish*, 782 F.2d at 327). Indeed, "[e]ven if the judge concludes that it is the contemnor's present intention never to [comply], that conclusion does not preclude the possibility that continued confinement will cause the [contemnor] to change his mind." *In re Grand Jury Proceedings*, 2001 WL 527401, at *1 (E.D.N.Y. April 27, 2001) (quoting *Simkin*, 715 F.2d at 37) (internal marks omitted). The discretion in deciding whether further incarceration may have coercive effect is unusually broad.[11] *See Simkin*, 715 F.2d at 38.

Kirwan. Armstrong's counsel stated, "He's been unable to produce any direct proof." Judge Jacobs inquired about what evidence Armstrong had to back up his claims about the missing gold bars he purportedly gave to Setogawa. Counsel replied, "He has been unable to produce any documentation that he turned over gold bars to Mr. Setogawa. And, uh, I have nothing else to tell the Court. If I had those documents, believe me, I would be more than happy to provide them not only to the Receiver, but Judge Owen and this Court."

9. In a mandate and order from the Court of Appeals dated February 15, 2001, the Second Circuit, in addition to summarily denying the petition, stated, "[p]etitioner is warned that

the filing of future frivolous mandamus petitions may result in sanctions." For a more complete discussion of Armstrong's numerous appeals, see this Court's Memorandum and Order dated March 9, 2001, *SEC v. Princeton Econ. Int'l, Ltd.*, 2001 WL 237376 (S.D.N.Y. March 9, 2001).

10. I observe that this affidavit was not even originally put before me; it was submitted to the Second Circuit in connection with an application for a writ of mandamus.

11. In this regard, I note that the Court may rely on its prior observations of the contemnor and need not hold a new factual hearing. *See Simkin*, 715 F.2d at 38 & n. 3.

As Armstrong's protestations and rhetoric become more vituperative with respect to the motivations of this Court, the Temporary Receiver, the SEC, the CFTC and the U.S. Attorney's Office, I am persuaded that he is just now starting to feel some effects of his continued confinement, especially since his appeal of the Contempt Order failed. Further, his various other attempts at undermining the Contempt Order by pursuing extraordinary forms of appellate relief, which have in some respects provided him with hope of release and thereby reduced the coercive effect of incarceration, have fallen short. It is only now that, with the exception of a few petitions that remain *sub judice,* the appellate remedies have yielded no success that he will feel the requisite degree of coercion and understand that the only way out of his civil confinement is compliance with this Court's Contempt Order.

■ Finally, I observe that while it is a matter of discretion to continue Armstrong's contempt indefinitely—which I am exercising here based on the record before me—I am aware that his civil confinement cannot last forever. *See Thom,* 760 F.2d at 740 (quoting *Maggio v. Zeitz,* 333 U.S. 56, 76, 68 S.Ct. 401, 92 L.Ed. 476 (1948)). However, the landscape of caselaw addressing this issue reveals that Armstrong's confinement has not yet approached an inappropriate duration, espe-cially given the enormous value of the missing assets and my finding that his detention remains coercive and not punitive. *See Thom,* 760 F.2d at 740 (considering dollar value of missing assets and contemnor's character); *CFTC v. Wellington Precious Metals, Inc.,* 950 F.2d 1525, 1531 (11th Cir.1992) (evaluating contemnor's 22 months of detention at time of decision and holding that civil confinement may continue for "many months or perhaps even several years"); *Hankins v. Civiletti,* 614 F.2d 953, 954–955 (5th Cir. 1980) (upholding civil confinement for approximately three years at time of decision where contemnor claimed he lacked possession, custody or control and argued that privilege against self-incrimination spared him production of certain records). In this regard, it is appropriate to note that one in civil contempt keeps the key to his cell in his own pocket at all times.

The foregoing constitute the Court's findings of fact and conclusions of law.

Accordingly, Armstrong's confinement in the Metropolitan Correctional Center on an order of civil contempt will continue with this Court evaluating from time to time, on its own initiative or application from any party to the above-captioned actions, whether release is warranted.

So ordered.

APPENDIX A

## O'MELVENY & MYERS LLP

LOS ANGELES

CENTURY CITY

IRVINE

NEWPORT BEACH

SAN FRANCISCO

TYSONS CORNER

Citigroup Center
153 East 53rd Street
New York, New York 10022-4611

TELEPHONE (212) 326-2000
FACSIMILE (212) 326-2061
INTERNET: www.omm.com

WASHINGTON, D.C.

HONG KONG

LONDON

SHANGHAI

TOKYO

June 15, 2001

OUR FILE NUMBER
684,617-001

WRITER'S DIRECT DIAL
212-326-226-

Bernard V. Kleinman, Esq.
3000 Westchester Avenue
Suite 207
Purchase, NY 10577-2523

WRITER'S E-MAIL ADDRESS
tschiavoni@omm.com

Re:     *Princeton Economic Institute*

Dear Mr. Kleinman:

I reviewed a package of papers from Mr. Armstrong that generally bear the date April 12, 2001. He appears to have mailed some or all of these papers to the Supreme Court. Once again, Mr. Armstrong has gone to great lengths not to attach the Contempt Orders that were issued in August 2000. As you know, these Orders set out in great detail what Mr. Armstrong needs to do to comply. The Orders identify the assets that he has refused to turn over. The Orders also set out in great detail the basis for the contempt findings. Mr. Armstrong does not attach these Orders to his "appendix." Nor does he draw the Court's attention to any of the provisions of these Orders. Rather, Mr. Armstrong simply attaches the one page handwritten Order that was handed to the Marshals on January 14. He then suggests that this is the only Order that has been issued concerning his contempt and argues that this Order is ambiguous. All of this only suggests that Mr. Armstrong wants to divert attention from his actions and the assets that he continues to withhold. After all, he has offered no explanation for why he has failed to turn over these assets. Otherwise, someone in Mr. Armstrong's situation would have long ago offered an explanation for the missing items. Certainly, this is how a lawyer would deal with this issue.

We have previously written Mr. Armstrong to express our concern about these types of intentionally misleading pleadings. This sort of submission is frivolous and wasteful. Even worse, this is all a tremulous waste of time for Mr. Armstrong. Please convey these points to Mr. Armstrong.

We stand ready to provide any reasonable assistance that Mr. Armstrong may need to comply with the District Court's turn over Orders. We have offered to meet with Mr. Armstrong. We have also offered to consider any explanation he may have for his non-compliance. In response, Mr. Armstrong has refused our offer of assistance and declined to meet with us.

Very truly yours,

Tancred V. Schiavoni
for O'MELVENY & MYERS LLP

cc: Martin Armstrong
NY1:812179.1